## Schulze Baking Co. et al. v. Daniel's Adm'r.

(Decided Dec. 3, 1937.)

HARRY B. MACKOY for appellants.

ODIS W. BERTELSMAN and BEN BERKOWITZ for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

On May 2, 1935, James A. Daniel resided at No. 152 on the south side of Fairfield avenue in the town of Bellevue, Ky. Its location is 126 feet west of Berry avenue and 50 feet east of Hallam street which entered Fairfield avenue from its north side, but does not cross it. The appellant and defendant below, Schulze Baking Company, is a corporation engaged in the bakery business in the city of Cincinnati, Ohio, across the river from Bellevue. Mike Decker, a joint defendant and joint appellant, was in the employ of the corporate defendant as a driver of one of its trucks in delivering its bread to its customers at Kentucky points across from Cincinnati. Fairfield avenue, along the territory mentioned, is 66 feet wide, 26 feet of which (13 feet on either side) is taken up with sidewalks, leaving a space for vehicular travel of 40 feet. In the center of that space are two street railway tracks. Over the south one ran cars going east, and the north one carried cars going west. At the mouth of Hallam street where it enters Fairfield avenue was a stopping point for street cars going west and which stopped on the east side of the junction of those two streets, making the car when so stopped almost opposite the residence of Daniel.

The accident resulting in his death happened about 6:30 a. m., immediately in front of his house near the south curb.

Daniel was a man 67 years of age, active, and in full possession of all of his faculties. His employment at the time, and for a long while prior thereto, was with a railroad company in Cincinnati, Ohio, and his duties were the cleaning of freight cars after they had been emptied preparatory for loading for an outgoing trip. The first street car going across the river into Cincinnati on Fairfield avenue ran at about the hour indicated above, and it always stopped at the east edge of Hallam street. Decker was making a trip with a small truck, 6 feet wide from the outside fenders and 14 feet long, which was loaded with bread to be delivered to customers in Latonia, Ky. He was traveling east on his right side of Fairfield avenue, which was the south side. Just before reaching the front of Daniel's residence, he passed a street car on the south car track in Fairfield avenue going the same direction he was traveling, and at about the same time the street car above referred to going west stopped at Hallam street. A few moments before reaching the spot immediately in front of Daniel's residence, he, Daniel, came out of his house with some tin cans which the witnesses concluded were garbage cans. He went near to the outer edge of the sidewalk in front of his residence and set them down on the sidewalk. Decker was something like 20 feet from that point at the time Daniel sat his load upon the sidewalk near the curb, which was 7 inches higher than the bottom of the gutter next to it. Just as Decker attempted to pass him, distanced some two or three feet from the sidewalk, Daniel stepped out into the street, and came in contact with the side of the truck and was knocked down, with sustained injuries resulting in his death. The truck was traveling, according to the evidence, practically if not entirely undisputed, at a speed not exceeding 20 miles an hour. At the instant that Decker was passing Daniel, he observed that Daniel was leaving the sidewalk and entering upon the street, and he, Decker, turned his truck to the left, but it was too late to prevent decedent from colliding with the side of the truck.

The appellee, Durwood C. Daniel, qualified as the administrator of his father, James A. Daniel, and later

filed this action in the Campbell circuit court against defendants and appellants here, seeking the recovery of a judgment against them for $2,999 as damages to decedent's estate for alleged negligence in the destruction of his life. The negligence, as alleged in the petition, was general. It charged that Decker, as the servant of his co-defendant, operated the truck at the time with gross negligence and carelessness, and in that manner brought about the collision with decedent resulting in his death. The answer denied the negligence charged, and pleaded contributory negligence on the part of the decedent. Its denial formed the issues, and upon trial the jury, under instructions submitted to it, returned a verdict in favor of plaintiff against both defendants for the full amount sued for. Their motion for a new trial was overruled, and from the verdict and judgment pronounced thereon they prosecute this appeal. A number of alleged errors were contained in the motion for a new trial, many, if not all of which, are argued in brief of learned counsel for defendants on this appeal, but the chief ones relied on are: (1) Error of the court in giving instructions A and B offered by counsel for plaintiff, to the giving of which defendants objected, but which the court overruled and to which they excepted; and (2) that the court erred in overruling defendants' motion for a directed verdict in their favor, made at the close of plaintiff's testimony and at the close of all the testimony, and to which they excepted.

The chief objection to instruction A was that it submitted to the jury the requirement on the part of Decker to signal his approach to Daniel by blowing the horn of his truck as it neared the spot where the collision occurred, while instruction B is criticised because it erroneously submitted the speed at which the truck was traveling at the time of the infliction of the injury to Daniel. It told the jury that if it believed from the evidence the truck was traveling at a speed greater than 15 miles per hour and its speed was the direct and proximate cause of the injury, then it should find for plaintiff and assess the damages in accordance with another instruction defining the measurement of the damages, and to which no objection is urged. We have concluded that under the facts disclosed it will be unnecessary to discuss any of the other grounds argued by learned counsel

than the ones mentioned, and they will be considered in the order named.

1. The criticism of the portion of instruction A referred to is based upon the fact that Daniel was never in peril from the movements of the truck until he suddenly stepped from the sidewalk onto the street as the truck was passing him, and that the situation was not one that the driver of the truck was called upon to signal his approach. The ground for the criticism of instruction B is that section 2739g-86 of Baldwin's 1936 Revision of Carroll's Kentucky Statutes was in force at the time, it being section 7 of chapter 106 of the Acts of 1932, and it limits the speed of trucks of the weight of the one involved here at 20 miles per hour while traveling in incorporated cities. That section had the effect, as we held in the case of Hopper v. Barren Fork Coal Company, 263 Ky. 446, 92 S. W. (2d) 776, to repeal a prior section of our statutes (2739g-51) prescribing a maximum speed of only 15 miles per hour at such places for the character of truck here involved. Clearly, the instruction here involved (B) was therefore erroneous, but whether prejudicially so or not we will not now determine, because of the conclusions we have reached with reference to ground (2) later to be considered and determined. Likewise, we are inclined to the opinion that the submission in instruction A of the failure of the driver of the truck to signal his approach was erroneous because, as stated, the situation did not develop into one calling for or requiring such signal; but this error may also be put aside because of the conclusion reached with reference to ground (2), supra, to which we will now direct our attention.

2. The determination of this ground requires a summary of the evidence heard at the trial. As hereinbefore stated, Decker was traveling at a speed not exceeding 20 miles per hour. One witness, in giving his opinion as to the speed, said: "I judge he was going between 15 and 25 miles, somewhere along there. * * * There was nothing noticeable in his speed." That witness was the only one out of four or five who testified as to the speed and who placed it (doubtfully) beyond 20 miles per hour; a majority of them fixing it at a lower rate than 20 miles per hour. We, therefore, conclude that it may safely be said that the speed did **not**

exceed 20 miles per hour, and most probably less than that. The space between the south street railway track immediately in front of Daniel's residence (and all along the south side of Fairfield avenue) was 12 feet wide, but street cars projected over that distance one foot, leaving a clear space for the travel of vehicles of 11 feet. The truck occupied, as we have said, but 6 feet of that width, leaving an unoccupied distance of that 11 feet space (even if a street car was passing immediately in front) of 5 feet. The truck was some two or three feet from the curb, and immediately after making the turn to save Daniel from the perilous position into which he was entering when he left the sidewalk, it was turned by the driver so as that its left wheels entered upon the south side of the eastbound railway track.

Four eyewitnesses testified as to how the accident occurred besides Decker; he being the fifth one. They were Baumgartner, the motorman on the eastbound street car that Decker had just passed before the fatal collision; Lach, an employee on that same car who was standing on its front platform; a Mr. Edwards, who had a seat on the rear end of the westbound car that stopped at Hallam street, and a Mrs. Hughes, who was on the north sidewalk of the street nearly opposite to Daniel's residence. Decker, after giving a history of his trip from the bakery, and the route over which he traveled, testified that he was traveling between 15 and 20 miles per hour, and that he first saw Daniel appear upon the sidewalk with some tin cans, and that he sat them down on the walk some distance back from the curb and was partially bending over them for some purpose, and that just as the truck arrived opposite to Daniel he suddenly turned and started off the sidewalk and came in contact with the side of the truck; that he heard the noise, but when he discovered, by a side glance, that Daniel apparently was approaching into the street, he turned to the left, but was unable to avoid the collision. When he saw Daniel set down the cans he was between 20 and 30 feet of the point opposite to him in the street. He also testified that he of course entertained no idea that Daniel intended leaving the cans and enter upon the street.

The witness Baumgartner testified that he was some short distance west of the point of the collision

and the first he saw of Daniel was that he started from the sidewalk toward the street, "and it looked to me as if he just bursted his head right into the side of the truck." The witness Lach, who was standing on the front platform of that same street car of which Baumgartner was motorman, said: "I seen this old man standing stooped over the galvanized can, and there was a Dayton car pulling up on the opposite side of the street and this old man turned and started to run toward this car; he had a lunch box in his hand and started to run across the street toward the car (one on the north track going to Cincinnati and which Daniel customarily took to go to his work for the day). He made, I judge, about two steps and ran right into the side of this here truck." The witness Edwards was a passenger occupying the rear part of the Cincinnati street car that had stopped at Hallam street on its way to Cincinnati, and occupying the north track in Fairfield avenue. He was well acquainted with Mr. Daniel, and stated that he and Daniel most always traveled that car in going to their daily tasks in Cincinnati; and when the car stopped he looked out for his friend Daniel. He testified—"I seen Mr. Daniel start coming out, and just as soon as he got started there I could just see him moving, there was two cans there, I think, or something there I did not recognize what it was, and he always took that car down with me every morning, he never missed that car at all, and when he came he thought he could make it to Hallam Street there, and instead he did not make it at all, he just went right into the side of the car.

"Q. You say he ran right into the side of the car? A. Right into the side of the car between the front fender and back fender, the way I seen it.

"Q. Whose car was it that he ran into? A. Mr. Schulze's baking wagon."

Mrs. Hughes testified that she had arranged for a taxicab to meet her at the junction of Fairfield and Berry avenues to take her to a farm that she owned near Madison, Ind., and that she had arrived and was waiting for the taxicab and spent her waiting period walking up and down the north side of Fairfield avenue. She testified that she saw Daniel coming down the steps

from his residence to the sidewalk carrying some cans that looked to her like garbage cans; that he came down the steps and leaned over to set them down on the walk; and that as he did so the truck hit him. Such was her testimony upon her examination in chief, but in the same examination she stated that the truck did not mount the sidewalk, and it is established by all the proof that it did not do so. She, however, stated that the truck was close enough to the sidewalk to strike him, "because there was nothing there to hit him," except the truck, which she positively stated did strike him. However, she frankly admitted that the truck was between her and Daniel, and that she could not see over, around, nor through it, and could not tell what was happening on the south side of the truck, from which side Daniel approached the street.

On cross-examination much of her positive and unqualified testimony given in chief was explained and qualified so as to make it in accord with the physical surroundings and conditions from the standpoint of which she testified, i. e., her location on the opposite side of the street at the time of the collision with the car between her and the deceased. She was asked on cross-examination whether Daniel was standing between the can that he sat upon the sidewalk and his house at the time of the collision, to which she answered: "Well, he must have been. He was holding the can and putting it down when he was hit. He must have been between the house and the can, I would judge." She repeats that statement in answering another question. To test the accuracy of those answers she was asked and answered:

"Q. Now suppose you or Mr. Daniel were coming down from the house and you put the can down on the sidewalk here, could you indicate about where it was put? Use this old fashioned cuspidor? A. I didn't see it put because he didn't get it put before he was knocked over, and the can was knocked over. It was not much putting to it.

"Q. He had put it down, hadn't he? A. He was leaning over to put it down—sure."

She was then shown a map, made by an engineer and used on the trial, and was asked to indicate on it the place on the sidewalk where the cans were placed as

she had stated. She said that she could not do so, and that "all I can say I saw the truck hit him, he had the can and was placing it down." She then repeats that the deceased was between the house and the can at the time he was hit by the truck. Later in her cross-examination she was asked what part of the truck came in contact with Daniel, and she answered: "Well, it looked like to me the side of it. It looked to me like that is where I would have judged.

"Q. In other words, it was the side of the truck and Mr. Daniel that came into contact? A. That is what it looked to me like."

Following that, and in the same cross-examination, she was asked: "You didn't actually see the truck hit Mr. Daniel did you? A. I must have did, sure."

A Mr. Forster was introduced as a witness by plaintiff. He was riding in a bus going west on Fairfield avenue over to Cincinnati, and it was somewhere east of the point where the accident occurred and near Berry avenue. He testified that he saw Mr. Daniel standing in the gate in front of his house just inside of his yard with his hand on the gate. His attention was then directed to something else, and in a moment of time he discovered Decker, the driver of the truck lifting the body of Daniel, he not being instantly killed, from the street and set him upon the curb of the sidewalk next to the street, and that Daniel was as much as 5 feet from the cans, which in some manner had fallen over on the sidewalk. Such, in substance, is all of the testimony directed to the occurrences at the immediate time of the happening of the accident.

Learned counsel for plaintiff, in seeking to sustain the submission of the case to the jury and the order of the court in overruling defendants' motion for a directed verdict, strenuously insist that the evidence as outlined created a duty on the part of Decker to signal his approach to the point where the accident happened so as to warn Daniel thereof, and also required him to slacken his speed, and that because he failed to do either he was guilty of negligence sufficient to sustain the action. They cite in support of those contentions a number of cases, among which are: Forgy v. Rutledge, 167 Ky. 182, 180 S. W. 90; Wilder v. Cadle, 227 Ky. 486,

13 S. W. (2d) 497; Best's Adm'r v. Adams, 234 Ky. 702, 28 S. W. (2d) 484, and Trainor's Adm'r v. Keller, 257 Ky. 840, 79 S. W. (2d) 232, 233. They deal with the questions of the duties of drivers of motor vehicles on streets; to be on the lookout for pedestrians or other persons upon the streets, and to give warning of their approach, and to control their speed in accordance with the exigencies of the case. But each and every one of them define duties of drivers to persons upon the streets and who are liable to become endangered by collision with the particular involved vehicle; or with persons who are in a place of safety, but whose demonstrations clearly indicate an intention on their part to move or get in front of the approaching vehicle, and who from the surroundings are clearly unaware of its approach. The latter was the situation under consideration in the Trainor Case, supra. In that case, the pedestrian who was killed was at a regular street crossing and in the act of crossing the street upon which the automobile that struck him was traveling and where he sustained his injuries. The opinion interpreted the evidence in the light of the surroundings of that case as sufficient to carry knowledge to the driver of the guilty car that he (deceased) was bent upon crossing the street and was oblivious to the approach of that car. No signals were given, and in stating the general rule that should govern drivers of cars in such situations, we said: "While a driver of an automobile is not required to anticipate that a pedestrian seen in a place of safety will leave it and get in the danger zone until some demonstration or movement on his part reasonably indicates that fact (Peak v. Arnett, 233 Ky. 756, 26 S. W. (2d) 1035), yet cases do arise where it becomes the driver's duty to give warning to one on the highway or in close proximity to it who is apparently oblivious of the approach of the car, or one whom the driver, in the exercise of ordinary care, may reasonably anticipate will come into his way. Best's Adm'r v. Adams, 234 Ky. 702, 28 S. W. (2d) 484. We are of the opinion that under the conditions disclosed in this record the jury should have been permitted to say whether the defendant was negligent in not complying with the statutory duty of sounding the horn when necessary as a warning of her approach. Wener v. Pope, 209 Ky. 553, 273 S.

W. 92; Hart Dry Cleaning Company v. Grizzel, 218 Ky. 111, 290 S. W. 1057; Wilder v. Cadle, 227 Ky. 486, 13 S. W. (2d) 497; Jefferson's Adm'x v. Baker, 232 Ky. 98, 22 S. W. (2d) 448; Best's Adm'r v. Adams, supra.''

That case is the strongest one to which counsel for plaintiff call our attention in support of his theory of the case. But a reading of the opinion will clearly demonstrate that the facts are most materially different from those involved in this one. There, the testimony clearly indicated that the deceased was not only oblivious to the approach of the guilty car driven by defendant therein, but it was demonstrated that in that oblivious condition he was then engaged in approaching the street and with a demonstrated determination to cross it, in which circumstances we held that a signal from the car might have warned him so that he could stop and let the car pass, or that an application of the brakes might have prevented the plainly inevitable collision. But here, all of the testimony shows that Daniel was engaged in no such indicating movements while coming from his residence onto the sidewalk with the cans, nor while placing them thereon. No movement of his indicated to Decker that he contemplated leaving them there and to immediately get into the street, with the evident purpose of crossing it and boarding the street car on the north track destined for Cincinnati, and upon which he traveled each morning to his work. No such purpose was ever manifested until the truck got immediately opposite him, when he turned from his stooping position over the cans and immediately stepped from the sidewalk onto the street as the truck was passing.

The testimony of Mrs. Hughes, when viewed in its entirety, is not in conflict therewith, since it will be remembered that she positively stated that the compact between Daniel and the car was on ''the side'' of the latter, and that the collision was not a frontal one. While she stated that the truck hit Daniel while he was on the sidewalk and stooping over the cans (being between them and his residence) yet she frankly admits that she could not see on that side of the car, and, clearly, her apparent unqualified statement was but her conclusion, since no one testified or claimed that the truck ever mounted the sidewalk. There was nothing,

therefore, to indicate to Decker, at the time he first saw Daniel while he was putting down the cans on the sidewalk and stooping over them, that he contemplated any such dangerous movement. In such circumstances, the rule is that the precautionary measures, here insisted on by counsel for plaintiff, are not required to be taken, and which rule is most emphatically stated in the Trainor opinion, when it says: "A driver of an automobile is not required to anticipate that a pedestrian seen in a place of safety will leave it and get in the danger zone until some demonstration or movement on his part reasonably indicates that fact." The general rule, as so stated in that opinion, is likewise approved in the cases of Peak v. Arnett, 233 Ky. 756, 26 S. W. (2d) 1035; Lieberman v. McLaughlin, 233 Ky. 763, 26 S. W. (2d) 753; Field v. Collins, 263 Ky. 474, 92 S. W. (2d) 793; Deshazer v. Cheatham, 233 Ky. 59, 24 S. W. (2d) 936; the Hopper Case, supra, and cases cited in those opinions.

It is true we have modified it to some extent as applied to infants who might be upon the sidewalks and engaged in some activity clearly indicating the possibility of their entering upon the streets while playfully engaged therein. In such circumstances, we have announced the rule that it would become the duty of the operator of the car in such a situation to slacken the speed of his vehicle, and, if necessary, to give a warning of the approach of the car for the protection of immature infants. But we have never qualified the general rule as applicable to adults, except in situations such as are described in the Trainor Case. This case is clearly differentiated from it and others of like nature. It presents simply and only a case where an adult person in full possession of all of his faculties was in a place of safety and engaged in no conduct or activity in anywise indicating that he contemplated leaving that safe place, until defendant's truck was immediately opposite him. We entertain no doubt that he was unaware of the approach of the truck and had his mind centered exclusively on reaching the street car destined for Cincinnati on the north track opposite his residence, which, as we have seen, was the one he always boarded to go to his work for the day. The unfortunate occurrence is to be deplored but the grounds relied on for recovery are in-

sufficient for that purpose, since in the circumstances none of the duties, the violation of which are relied on, were owed to him at the time by the driver of the truck. His thoughtlessness was the proximate and only cause of his disaster.

Wherefore, for the reasons stated, the judgment is reversed, with directions to set it aside, and to sustain the motion for a new trial, and for proceedings consistent herewith.