MISSOURI PACIFIC TRANSPORTATION COMPANY v. GEORGE.

4-5581                                          133 S. W. 2d 37

Opinion delivered October 23, 1939.

*D. H. Crawford, Huie & Huie, House, Moses & Holmes, T. J. Gentry, Jr.,* and *Eugene R. Warren,* for appellant.

*G. W. Lookadoo* and *J. H. Lookadoo,* for appellee.

BAKER, J. George, who will be referred to by name or as plaintiff or appellee, sued Missouri Pacific Transportation Company, hereinafter called appellant, defendant or company, to recover damages for injuries alleged to have been suffered by him at Gurdon in Clark county in the early morning of August 22, 1938.

Upon a trial there was a verdict and judgment for $15,000 from which comes the appeal.

Appellant argues that the trial court erred in three particulars: (1) The court erred in refusing to direct a verdict for the defendant; (2) there was no evidence that the defendant was guilty of negligence; (3) that the verdict is excessive.

In the discussion of the matters that have arisen upon this appeal the appellant company has presented its contentions under the three heads stated, including incidental subjects such as contributory negligence and other matters pertinent to its defensive position. We shall follow this general trend in our discussion, but the first and second of the divisions will be regarded as consolidated because identical.

We shall state some facts about locations and conditions concerning which there seems to be no controversy. The bus was driven into Gurdon shortly after midnight. It had come from Little Rock, was going south 'till it reached Main street in the city when it turned east on the street which is a part of highway No. 53. After proceeding a short distance along Main street, it turned north across a sidewalk, on the north side of Main street and stopped or parked ten or twelve feet north of this side walk. It was then headed, just as it was driven in, toward the north. Whether this street where the bus stopped was a blind or closed street north of the bus does not appear from the record as abstracted.

The record does show that this was the usual parking place for the bus on such occasions except that there is a contention that at this time it had gone north a short distance more than usual. We fail to see the importance attached to this contention, but state it merely in an effort at achieving accuracy. While the bus was parked the driver went to the office to make his report; returning after these duties had been performed, he made ready to leave. If George had not witnessed the arrival of the bus he had observed its presence and knew from years of observation that, in a short time, it would back out from the place where it had been parked, turn west to highway 67 to continue its journey to the south. He saw the driver as he went around the bus testing the tires with a hammer and realized this was done preparatory to leaving. The driver of the bus, as he drove to the parking place, or very shortly thereafter, observed George standing on or near the sidewalk, but east of the point of crossing used by him on that occasion. He was still at this same place leaning against a pole "when the driver returned to the bus." It is not clear whether the driver meant to indicate by this statement the time at which he came back from the office or when he had gone around the bus testing the tires. He had just said the bus was 35 or 40 feet long. The materiality of this matter may become important when time to make this inspection is considered. In doing this he went within ten or twelve feet of George where he was standing at the post.

When the bus backed out George was hit or at least fell back away from the bus toward the east. He cried out at the time "What do you mean?" This cry was heard by the driver of the bus and was the first he knew of the alleged accident.

We think the foregoing is a statement of the material, undisputed facts showing the setting, a few minutes, perhaps, a few seconds before alleged accident occurred.

We shall now state the relative contentions of the parties and our conclusions thereon.

George was a deputy sheriff, constable and night watchman. He had been such watchman for a long time. That was the reason he met the night bus. George's statement is to the effect that, as he looked toward the west from where he stood at the pole near the rear of the bus, he saw the freight depot lighted up where men worked every night moving and transferring freight. His attention was attracted to some matters he thought he should investigate. He started west along the regular walk-way when he was struck by the bus backing rapidly from its parking place about 250 feet south of the depot. He says no horn was sounded or other alarm given by the driver. When he had looked before proceeding along the walk to the rear of the bus a moment before, it was still standing. In regard to the noise made by the motor when starting up, he said he did not notice it, and believed it had not been stopped during the parking interval. Wilkerson, the driver, was positive he had stopped the motor before going to the station 250 feet away, and says he was instructed to shut off the motor when it was necessary to stop as long or longer than two minutes, that the motor roared when starting up, because he always raced it momentarily. The driver says he backed out slowly. He did not know that George had moved from the position near or at the pole 'till he heard the cry "what do you mean?" While there is other testimony tending to support or contradict evidence adduced as above set out, we shall content ourselves with these declarations of the two principal actors.

Since we may not determine facts, as will be set out later, the principles of law involved and application thereof may be determined as accurately from the factual statements above as if the whole record or bill of exceptions were dumped into our laps.

May we hold as a matter of law that George was guilty of contributory negligence? It is urged most forcefully that he walked behind this moving bus. Such is not the evidence when considered in the light most favorable to support the verdict of the jury. Before he started to cross he had looked, and the bus was standing.

True, he had no right to block the way by standing therein, but the relative and reciprocal duties of pedestrians and vehicles are equal, and each should look out for the other and their conduct in the use of streets under the prevailing conditions determines negligence or the lack of it. Since it may not reasonably be denied that George had a right to be upon the sidewalk under the conditions stated by him, the question of his negligence was properly one to be determined by the jury, and not to be declared dogmatically by us as a matter of law.

Appellants cite an authority defining the duty of a pedestrian standing in a place of safety to remain in such place 'till he shall, by some movement, clearly demonstrate his intention to depart therefrom.. *Schulze Baking Co.* v. *Daniel's, Admr.*, 271 Ky. 717, 112 S. W. 2d 1011.

We think the declaration most probably is sound in principle when applied to the particular case, but cannot see how it may be applied here. Appellants say: ''The rights of pedestrians and vehicles are reciprocal, and each must anticipate the movements of the other.'' Learned counsel's statement need not be fortified by citations of authorities.

May not the jury have reasonably determined that George's statement as to how he was injured was substantially true? Wilkerson, the driver of the truck, did not see him. That is the reason for the citation of the above case from the jurisdiction of Kentucky. The presumption invoked was to supply Wilkerson's failure to look or observe just where he was driving when he backed the 35 or 40 foot bus into Main street, over a walkway used by pedestrians.

We do not suggest that the driver should not have backed out or across the walk. He may have been on a blind or closed street, but even if the street were open he might properly have backed using and employing care commensurate with the risk at the time and place. May not the jury have found that according to his own evidence he assumed the way was clear without looking to see, and backed out hurriedly?

Then there is the question whether he gave any signal? The evidence is in sharp conflict. The jury decided this matter. The law is well settled and recognized. *Texas Motor Co.* v. *Buffington,* 134 Ark. 320, 203 S. W. 1013.

In the cited case there is a well stated, clearly announced declaration of law by the late Chief Justice McCULLOCH. It not only sets out the duty of the driver backing a car into a street, but, in addition, it is authority for the conclusiveness of the jury's verdict in settling the question therein of plaintiff's contributory negligence. Numerous authorities are cited to support the text. These are all decisions from our own court. For that reason we think it unnecessary, if not pedantic, to resort to decisions of foreign jurisdictions.

In support of the verdict we have already discussed the facts as they could or might have been found by the jury. With some degree of reluctance, we again approach "a vexed and vexing" proposition, the conclusive effect of a verdict.

The late Mr. Justice BUTLER whose scholarly attainments and industry might well be emulated, gathered a list of the well-considered cases and set them forth in the opinion prepared by him for the court deciding *Missouri Pac. Trans. Co.* v. *Sharp,* 194 Ark. 405, 105 S. W. 2d 579. Just a little later his conclusions were again approved in *Missouri Pac. R. R. Co.* v. *Henderson,* 194 Ark. 884, 110 S. W. 2d 516. I have decided not to copy anything from either of these opinions, lest some one interested in the subject might deem my selected part as the vital portion and for that reason fail to read these opinions in their entirety. It is remarkable with what frequency learned counsel, zealous in their advocacy, present this matter in some new phase, although there has been practical uniformity in all decisions. Indeed, it has come to us from our earliest recorded decisions. *Hynson* v. *Terry,* 1 Ark. 83.

It was alleged as error in this last cited case that the trial judge "charged the jury on matters of fact which is

expressly forbidden by the constitution." This provision of the constitution of that date is present in our Constitution of 1874, and, under well-recognized principles as announced by a long line of decisions, we must be deemed to have adopted the earlier decisions interpreting that provision of the constitution when we put the same language in the Constitution of 1874.

Avoiding a further superfluity of words which would bring no corresponding benefit, we must content ourselves with the announcement that from that earliest date to the present time this provision of our organic law has remained intact and unimpaired. So now when we are confronted with substantial evidence found to be true by verdict of the jury, the effect of which evidence does not violate or contradict any well known natural law or principle, we may not feel at liberty to disregard such verdict.

In this case, if we were triers of facts we might believe appellee to be a chronic plaintiff seeking by devious ways and methods to extort by "hand-made" processes money from those with whom he came in contact, and although we might feel that the verdict is contrary to the preponderance of the evidence, we are powerless in the face of this constitutional provision as construed throughout the years to enter that field so peculiarly belonging to the jury. If this system is faulty and defective the remedy lies with the people and not with the Supreme Court. It must appear then that argument upon the weight of evidence, upon credibility of witnesses, must be regarded as argument to be made to the jury and finally to the trial court to correct the alleged errors of the jury. The verdict of the jury approved by the trial court forecloses our consideration except to determine whether it may be supported by evidence of substantial nature.

We now dispose of the last proposition argued by appellants upon this appeal. They urge that the verdict is excessive, and was rendered as a result of passion and prejudice. We think it might well be conceded that no passion and prejudice are shown unless same appear

from the amount of the recovery. It is argued that the testimony of the physician who describes the alleged injuries should not be believed; that it is corruptly false, demonstrated by X-ray pictures which were charged to have been made by trick photography. Forceful argument, vigorous denunciation and pointed invective are very strongly persuasive that this may be true. We are told by appellants that the plaintiff has suffered no real injury; that the evidence indicating the almost total impairment of certain bodily functions which impairment will remain as permanent lesions was knowingly untrue. This charge is far reaching in its implications. If it was so apparent that the correctness of appellant's charge is true in this regard, the trial judge must have been as well informed of its correctness as appellants and their learned counsel. The evidence that this condition prevailed must rest solely, at this time, in the zeal and advocacy of counsel who present the issue. Again we are forced to assert that these arguments are appropriate to have presented the matters in controversy to the jury and trial judge.

We evade no responsibility in this respect; it does not reach us. If the appellee's testimony and that of witnesses, including the doctor, were believed, the verdict is supported by evidence of a substantial nature. That being true, necessarily the charge of passion and prejudice must be deemed as eliminated. This is a hard case; the kind that makes shipwreck of the law. Affirmed.

GRIFFIN SMITH, C. J.; McHANEY and HOLT, JJ., dissent. Mr. Justice FRANK G. SMITH concurs in the result.

GRIFFIN SMITH, C. J., (dissenting). J. C. George, plaintiff below and appellee herein, at the time of the alleged injury held commissions as constable and deputy sheriff, and in addition was night watchman in the town or city of Gurdon. He had been so engaged for more than seven years. The so-called "accident" which formed the basis of his suit in the Clark circuit court, with a resulting judgment for $15,000, occurred August 22, 1938.

East Front street in Gurdon runs north and south by the Clark County Bank between the business section

and the railroad property. There is a small park and a monument. On either side of the park there is a driveway wide enough for cars to pass. The driveway leads from Main street to the passenger depot. Main street runs east and west and leads to Highway No. 67.

On the night in question the southbound bus came in on the highway, turned into Main street proceeding east, then turned to the left into the driveway and stopped ten or twelve feet from the walkway used by pedestrians in traveling from the Clark County Bank environment across the railroad to the business section on the west side.

Appellee contends that between one and two o'clock of the morning of August 22 he had completed his "rounds" and had just reached the bank when the bus drove in. While the bus was stationary at its stopping point, appellee walked to a light pole with which he was familiar. While so occupied, appellee claims he saw some one going in the direction of the freight depot, southwest of the point where he was standing. While watching the person or persons he says he thought he saw, he entered into conversation with himself, thereby informing himself that he would cross the tracks and go to the freight house, "and maybe see who it is."

Appellee testified that he then "looked and tried to figure everything was clear." Continuing, he said: "When I started out, this bus backed up without any notice whatever and didn't sound a horn or anything else and slammed into me and I was in the middle of it before I saw it, and it struck me on the leg a little bit and I threw my hand up and gave myself a shove . . . I fell flat and wiggled out from under it some way."

The driver of the bus, he says, and some one else, carried him to a hotel. A doctor was called and gave him a "shot," and he was taken home.

Since that time, appellee contends, he has been in bed most of the time. Was injured in the back. Insists his left leg is practically paralyzed—"can use it a little, but seems like it gets worse all the time." Was in perfect health before the injury. Had never been sick,

according to his original direct testimony, except an attack of pneumonia 25 years ago.

John Smith, a WPA worker, who says he was in Gurdon the night appellee asserts he was injured, corroborates appellee's statement as to the manner in which the so-called "accident" occurred. He testified that when appellee was walking from the bank corner the bus started suddenly and backed out, "and I seen it knock him over." On cross-examination the same witness said: "Listen, he was behind the bus where I could not see it." This witness says he heard the bus motor start. Later he testified: "The bus came up on this side of me and kept me from seeing him."

This witness admitted he had never been in Gurdon before at that time of night; that he did not have a car and had to walk home, a distance of two miles. He didn't have a watch, but "figured" the accident happened about midnight. Did not remember about any trains passing, and could not name a single person he saw in town that night.

Dr. R. L. Bryant testified that he made an X-ray picture of appellee September 9, 1938, "and have seen him three or four times since then." The doctor's opinion was that appellee had a back injury. He found "subluxation of the joints that form the left sacroiliac. Sacroiliac seems to have been injured some on the left side."

In explaining an X-ray picture to the jury, the doctor said: "This does not show up plain. It can be seen better on this side. . . . Normally it is a fixed joint on the picture, and when there is a separation it widens that line." A second picture was introduced, which the doctor said showed a fracture of the fifth lumbar vertebra—the last one that joins the sacrum. The "body of it" was fractured on the right side, the left side being normal.

The only time witness had seen appellee was when the latter came to his office to have the X-ray pictures made. Prescribed some medicine for him October 10, 1938. When appellee called for the examination, he was

on crutches and was "hopping on his left leg, and said he had a severe pain in his back."

Dr. Bryant admitted there was a "regular method of treating cases of this kind in a cast," but had not undertaken anything like that. The patient was being treated by Dr. Green. Dr. Green did not testify.

R. M. Davidson, Missouri Pacific conductor, observed the bus when he was 2½ blocks from it—800 feet, he estimated. His attention was attracted by the noise of the motor in starting: "It was making all the racket in the world." Witness saw the bulk of a man walking toward the rear end of the bus. "It looked like he made two or three steps and the next thing I saw was the outline of a man down in a sitting position leaning against the pole. . . . When the man walked out toward the bus he was walking slowly like he was going to wave at somebody on the bus."

It is in evidence otherwise that before starting, the driver assisted two or three passengers on, and walked around the bus with a hammer tapping the tires to see if they were all "up."

Dave Bryant noticed the bus standing in the driveway. He "sat there a few minutes, watched the passengers get on, saw the driver turn off the inside lights, heard the motor start, and also heard two or three sounds of the horn." The bus started backing out slowly —about the speed a man would walk—and came on back about its own length and stopped, then drove back into the driveway where the passengers were unloaded. No one came to the back end of the bus, and the back end of the bus did not strike anyone. A few minutes later, after he had gone to the freight office, some one reported that Jesse George had been hurt. Witness went to the Commercial Hotel and asked George what the matter was. George replied that he had been watching two boys he thought were trying to break into box cars; that he started walking toward the freight depot, and the bus struck him. "He stated that his mind was on these two fellows, and he was paying no attention to the bus."

John C. Taylor saw a man standing by the light post near the rear of the bus. When the bus started to back out witness was sitting about the fourth seat from the front on the right side, facing the front. He heard the motor start, making quite a noise. Was looking back as the bus started. "As the bus was backing up slowly and as the bus came back and almost—probably just the back corner of the bus was even with him—he got within a step or two of the bus (I could not say exactly, but very close to the bus) and he threw up his hands and fell over on his side and back." Witness was positive George never touched the bus; was looking at him constantly. George was about two steps from the bus when he put up his hands and staggered back. That put him back almost to the pole he was leaning against, and that is where he was lying when the driver got out and went to him. The bus was not going any faster than a man could walk. Witness was a passenger who had come in on the bus, and while it stopped he got out to rest his legs. On cross-examination he said: "Mr. George threw up his hands and staggered back and fell on his side and back and said, 'What do you mean?' "

George W. Dovers, a passenger who got on the bus at Gurdon the night of the alleged injury, arrived there on the train at eleven o'clock. While walking around he first saw George standing by the pole. This was about 20 minutes before the bus came in. "After going to the Rex Cafe, I returned with two other men to get on the bus. I saw Mr. George standing at the same place—in the same position by the pole. After getting on the bus I was seated on the left side about two seats back of the driver. I looked back through the window on the right side of the bus when it started backing out. I saw the man who was standing by the post start walking toward the bus just as the bus started backing. I would judge that he got within two or three steps [of the bus when] he fell backward. He never was very close to the bus. I was looking directly at him and could see him from the waist up, but could not see his feet. . . .' Before the driver started the bus he counted his passengers, switched off the inside lights, and started backing like they always

do. I heard the motor start, and do not know of anything around there that could have kept [George] from seeing the bus back out. . . . After the [incident] Mr. George stated that he was walking west looking down toward the freight depot and the first time he saw the bus it was right on him and he put up his hands to push himself away from it, and fell."

Witness examined the side and back of the bus and could not see any prints where any one's hands had touched the bus. There was dust on the bus. If anyone had touched it, it would have shown.

E. M. Bradley and his wife were passengers on the bus. Mr. Bradley verified what other witnesses had said about the conduct of the driver in testing the tires with a hammer. After the bus got in slow motion George "walked out from the post and came toward the side of the bus—something like five or six feet from where I was sitting. [George] would first look toward the front of the bus and then back behind [it]. He was walking terribly slow toward the bus and got within about two and a half or three feet of it, [then] put up his hands and staggered back and fell. I saw George when he first started from the post and [saw him looking] toward the bus."

Mrs. Bradley testified substantially as did her husband, adding: "The bus driver counted the passengers and took something and tapped the tires and said 'all aboard.' He then turned the [inside] lights off, but I do not remember whether he sounded the horn. . . . Mr. George, who had been standing by the post, watched the bus, then [began walking toward it], looking at the driver while he was walking. When he got within a foot or a foot and a half of the bus, he threw up his hands and started staggering backward and fell, kind of on his side. His head and shoulders after he fell were about even with the post."

R. G. Wilkerson, driver of the bus, testified that when he stopped at Gurdon the engine was shut off. Had been driving to Gurdon three or four years, and knew George was night watchman. On the night in question

he noticed George standing near or leaning against the post. Had seen him at the same place before. Witness left the lights burning inside the bus [while it was stationary]. Also, the tail lights were burning. Attended to his routine duties and upon returning from the depot saw George still standing by the post. He then checked passengers to see that they corresponded with the tickets, took a hammer and tapped the tires to see that they were all "up"—which is the last thing done before leaving a station—then got in the bus, turned off the inside lights, started the motor, sounded the horn and began backing out about as fast as a man could walk. He had pulled up 10 or 12 feet clear of the sidewalk when he came in. The only person around the bus was Mr. George, leaning against the post, and George was 10 or 15 feet from the back [of the bus]. There was nothing to keep George from knowing the bus was loaded and ready to start. The motor made considerable noise in the process of acceleration. "When I was backing out, and just as the door of the bus got about even with the post, I heard someone say, 'What do you mean?' I then saw Mr. George over there on the ground within a few feet of the post and about 10 or 12 feet from the bus. I pulled up a little and got out. Mr. George said I had almost backed over him. I asked him how that happened, when he was standing back by the post, and he said: 'I started to walk across there and the bus was almost right up in front of me before I noticed it.' He then stated that he put up his hands against the side of the bus, and shoved himself back, and fell. I wanted to get a doctor, but George told me not to bother; that he would get some of the boys to take him home. He finally agreed to walk over to the hotel, I holding one arm, and another man holding the other. He told me the bus was passing along in front of him before he noticed it and that he had put up his hands unconsciously."

Dr. J. T. McClain, who had known appellee 25 years, was called to the Commercial Hotel the morning of August 22. "George was complaining of his left side and back. I gave him a hypodermic and asked him if he

thought he could go home. He replied that he believed he could. I drove him to his home, where he got out of the car unassisted and walked up the embankment to his house. . . . He smelled pretty strong from the effects of liquor. . . . I called on him the next morning. There were no marks or abrasions on his skin—no evidence of an injury except that when he would be touched at certain places he would say it was hurting. There was no discoloration of any kind. Saw him again that afternoon and he was in about the same condition, except that he had gotten some whiskey and was resting better. Had been around him on his beat at other times and had smelled the odor of liquor on his breath.'' On cross-examination Dr. McClain said: ''He smelled pretty strong of liquor that night and he talked a little like a drunk man and had all the movements of a drunk man.''

Dr. Theo. Freedman, of Little Rock, examined appellee October 3, 1934, in collaboration with Dr. Smith, for an alleged injury then complained of. No injury was found, but the X-ray disclosed an arthritis condition, evidenced by ''spurs'' which come out from the spinal process. There was also decrease in the space of certain vertebra in the lower part of the back.

Dr. D. A. Rhinehart, an X-ray specialist, testified he graduated from the School of Medicine of the Indiana University in 1913, taught anatomy in medical schools six years, and has been doing X-ray work for 19 years. Examined some X-ray pictures October 3rd and 4th, 1934, showing the condition of appellee's back. They showed a small spur on the right side of the lumbar vertebra, and a space between the last or the fifth vertebra on top of the sacrum. The condition was one usually due to arthritis.

Witness was then shown the second X-ray picture introduced in evidence in the instant case as an exhibit to Dr. Bryant's testimony. He stated that he could not see any fracture of the fifth lumbar vertebra, and that the patient [for the purpose of taking the picture] was turned slightly to the left. If a subject is thus turned, the picture appears different. ''This man was twisted

a little, [and] the picture does not show any injury to the sacroiliac joint, nor any fracture. The reason one line in the picture shows larger on one side than on the other side is due to the way the picture was taken.''

Dr. C. K. Townsend also examined the picture in question, stating that it did not show any fracture, but that it was evident the exposure was taken at an angle.

Dr. Joe F. Shuffield testified that, although appellee complained generally, and particularly of his back, etc., he could sit down and lean back in a chair as well as a normal man could. ''You cannot see or feel anything wrong with his back, and the muscles are about normal size. We X-rayed him and could not find anything wrong with the joints and bones in his back.'' Had examined the Dr. Bryant X-ray picture and saw nothing wrong with the patient except the indications of arthritis heretofore referred to. He testified positively that Dr. Bryant's picture was taken at an angle. Took a specimen of appellee's blood to Little Rock for analysis. It showed syphilis. This disease could cause paralysis. The nervous system and the blood vessels would also be affected. Syphilis could cause paralysis of one leg without affecting the other. Appellee does not have any symptoms that could not be caused by syphilis.

Dr. M. J. Kilbury, clinical pathologist, who examined appellee's blood, testified that three tests were used—Wasserman, Kahn, and Kline. All, he said, showed the presence of syphilis in the blood as strongly as is known—''4-plus positive.''

Following the testimony offered by appellant, appellee was recalled and denied having been under the influence of liquor when injured. He denied Dr. McClain's statement that he (appellee) walked up the embankment at his home when the doctor drove him there from the hotel. He said that the paralysis occurred immediately after contact with the bus; contended he was crippled and could not stand alone; denied he had ever had a venereal disease, and insisted there was nothing the matter with him prior to the incident of August 22d.

The prevailing opinion, in its statement of the facts and in its declaration of the applicable law, is the consensus of three judges of this court. A fourth concurs in the result.

Aside from inconsequential testimony the jury's verdict, in respect of appellant's negligence and consequent liability, rests entirely upon the testimony of appellee—the vitally interested party who asked that he be compensated to the extent of $50,000, and who has recovered $15,000. True, the witness, Smith, made certain statements; but, on cross-examination, he admitted that he was not in a position to see the transaction. What he says, therefore, is of but slight importance. The bolstering potentiality of his words is of no more significance than would be the voice of a stranger crying in the wilderness of would-be helpfulness. Such testimony is no more substantial than conversational comment subscribed for its record benefit—for the alimentation it was intended to afford, but which it does not supply. It is the type of testimony no passion-free jury should accept as substantial, and the verdict is one no discriminating trial judge should have believed was sustained by a preponderance of the evidence.

Let us further examine the record to determine, as the trial judge should have determined, where the weight of testimony lies.

Although we are not permitted, in this court, to reverse solely because the weight of evidence does not sustain the verdict, we may, and we should as a matter of judicial duty, analyze and particularize those cases wherein every rule of reason and all of the canons of construction point to a failure upon the part of a trial judge to apply that law which such judge, under his oath of office and the Constitution, is affirmatively required to administer.

In 1929 appellee claimed he was injured. Suit was filed in Clark county against the Gulf Refining Company. Appellee was then a carpenter, assisting in the construction of a building. Among his other duties, as set out in the complaint, the then plaintiff was directed

to carry heavy doors, and ". . . between the place where plaintiff was directed to work in building the doors, and the place where the doors were to be carried and hung, there was a highway, along the side of which was a deep ditch . . . with a levee embankment alongside." The complaint then alleged that plaintiff was directed by his foreman to carry the doors across the highway and across the ditch and levee, and that, "in view of the weight of the doors and of the manner in which the same had to be carried, and of the few men directed to carry the same, and of the depth and width of the ditch and size of said levee and of the smallness of the expense of constructing a bridge or safe passageway across the ditch and levee, it became and was the duty of the defendant, in the exercise of ordinary care for the safety of the plaintiff, to have caused a bridge or some other safe way of passage to be constructed across the ditch and levee."

It was then recited that by reason of the negligence of a fellow-servant, the weight of one of the doors was suddenly thrown upon the plaintiff, causing the following injuries: The tendons connecting the muscles of the plaintiff's back to the backbone were jerked loose from the backbone and the muscles were torn loose from the tendons. A great strain was suddenly forced upon the abdominal muscles of the plaintiff, and his nervous system was thereby shocked and he was otherwise strained and injured so that ". . . plaintiff's back and muscles and tendons thereof have been permanently and seriously injured and the strain upon the abdominal muscles caused the plaintiff to suffer a serious and permanent inguinal hernia, and has also caused the plaintiff to suffer a serious and permanent injury to the plaintiff's nervous system, and that each and every one of the said injuries has so affected the plaintiff that he is now and will always be in a weakened condition."

That suit was settled for a comparatively insignificant sum and the "permanent" nature of the injuries seems to have disappeared.

In 1933 appellee fell over a railroad speeder on the Main street crossing at Gurdon. Then, as in the instant

case, he was "making his regular rounds." In describing this accident he said: "I was crossing from the west side to the east side when all at once when I got over the main line about 10 or 12 feet from the main line the first thing I knew I ran into this speeder. When I did so I fell and the speeder turned over with me. . . . Something struck me and injured my back." The speeder was not in motion until appellee aggravated it. His conclusions as to this injury were that "My back was strained and may bother me as long as I live." He then added, by way of complimentary conversation, that "The settlement I made on account of injuries at Mena was a friendly settlement. I never have had any suit against any railroad or any other corporation on account of any personal injuries." The Gulf Refining Company was not, in contemplation of the complaining party, a corporation, notwithstanding the character of its corporate organization.

As late as 1935 appellee wrote the Missouri Pacific, demanding settlement for his skirmish with the speeder. In the letter he said: "It would be much better for all concerned if you would [reconsider my claim]. I could get medical treatment now and I sure do need it."

In November, 1933, he ran his wife's car into a train at the Main street crossing in Gurdon and claimed damages for the car.

In October, 1935, he got his foot too close to a steam pipe, in consequence of which infection developed. He collected from an insurance company for the foot injury.

On direct examination appellee was asked: "Q. Mr. George, what was your condition before you received this injury? A. I was in perfect health. Q. How long had you been in perfect health? A. Well, I never was sick. I had a spell of pneumonia about 25 years ago, and that is the first time that I had ever been in bed more than two days at one time in my life. Q. You had been in bed other times for what? A. The mumps."

On cross-examination there were the following questions and answers: "Q. Mr. George, you said before this accident occurred that you were a well, strong, and

able-bodied man. A. Absolutely. Q. In fact, there had never been anything the matter with you except some colds? A. I had a spell of pneumonia 25 or 26 years ago. Q. That was all? A. Yes, sir."

That these statements were not true was developed by further cross-examination, as shown, *supra*.

This case was tried on the theory that appellee deliberately walked from the telephone post to a position near the bus, timing himself to contact as the bus backed out, and then put his hand on the bus, or toward it, and simulated injury by falling and crying out.

I am somewhat doubtful of the correctness of this theory. On the contrary, I think the substantial evidence —in fact, all the evidence except appellee's statements— shows that appellee absent-mindedly walked from his place of security just as the bus started; that when appellee was within two or three feet of the bus he suddenly realized his position, and perhaps fell as a consequence of the sudden impulse that impelled him to self-protective action. Certainly his own negligence in walking out behind the bus as it started was the proximate cause of his injury, whatever the injury may have been.

Everybody concedes that the motor was running when the bus began backing out. Whether it had been left idling while the bus was parked (as appellee intimates) or whether it was started when the driver undertook his departure—in either event we know, as a matter of common knowledge, that a bus motor occasions an unusual noise. That, alone, was sufficient to warn appellee that the bus was in motion, or was about to start. We have held, in dozens of cases, that testimony of a person near a railroad that he or she did not hear the bell ring or the whistle blow, and that the witness' hearing was not impaired, is admissible to establish the claim of a plaintiff that statutory signals were not given.

There is no suggestion that appellee's hearing was not of the best, that his eyesight was not good, or that he was unfamiliar with the premises. On the contrary, it was his custom to meet the bus. He knew what its ordinary movements were, knew that after loading it would

back out, and knew it was dangerous to walk immediately back of it at such time. Even though it be held that appellant was guilty of negligence in not sounding the bus horn (if such be true), still appellee's own action in placing himself in the position of peril was the immediate cause of his injuries.

This brings us to a discussion of the credibility to be given appellee's testimony. Certainly, if there is substantial evidence to support the verdict, and if appellant was guilty of negligence, and if appellee was not equally contributorily negligent, a judgment for a sum commensurate with the injury should not be denied. With the exception of Smith's effervescing statements, all of the witnesses disagree so radically with appellee that one or more of three things appears: Either appellee was deliberately falsifying, or he was intoxicated to the extent that he did not know what his actions were, or all of the other witnesses are perjurers. Some of them are wholly disinterested. They merely happened to be passengers on the bus, and incidentally saw the transaction. In substance, they agree that appellee, after the bus started backing out, or coincident therewith, walked from a place of safety into one of peril. Weighed against the unanimity of this evidence, we have the statement of appellee who says he was looking for possible burglars; that before starting across the intervening space he looked to see that all was clear, and that the bus backed out and "slammed into him."

In his direct testimony relating to the previous condition of his health, appellee was untruthful. His misstatements are glaringly perverse; or, in the alternative, he undertook, for an anticipated compensation, to deceive all those with whom he communicated with respect to his former injuries and ills. On cross-examination he asserted that for 25 years there had "never been anything the matter with him" except a spell of pneumonia, and possibly measles. And yet, as late as 1935, we find him petitioning the Missouri Pacific Company to reopen and reconsider his claim for injuries alleged to have been received in connection with his skirmish

with the speeder; and the reason advanced was that of need for treatment.

In a statement dated May 11, 1930, referring to the Mena injury, he said: "I went back to work on the job and did what I could, but was unable to do any heavy lifting. . . . After we finished that job . . . . I came back to Gurdon and my back has hurt me since almost continually."

October 17, 1933, in a signed statement, he said: "My back never has gotten well and bothers me now." Again, in the same statement: "I have lost several nights [from] work on account of my injury. I manage to hold the job, but it is painful to do so. Sometimes my back does not pain me and sometimes it does, but when I step in a depression or go to step up on anything, it hurts my back."

September 12, 1934, in another statement, appellee said: "Since I made my original statement to Mr. Pegg in June of this year [with reference to the speeder accident] my condition has not improved and I am still very nervous—more so at some times than at others."

Assuming appellee truthfully delineated his condition in making these statements—and there is no testimony to the contrary other than the want of credibility to be placed in the witness himself—it must follow that he was not truthful in November, 1938, when he undertook to convince the jury that prior to August 22nd of the same year he was in perfect health, and had been so for 25 years.

We have, then, the situation of an interested witness who has impeached himself—a witness whose objective was to recover $50,000, yet a witness branded by scientific experts as syphilitic; a witness who did not even deny having syphilis, although in rebuttal he did disclaim ever having had a venereal disease. Syphilis, being a blood disease, could not be included in appellee's denial, although frankness here suggests the concession that he probably thought he was making a denial.

Against appellee's own repeated declarations of injury in 1929, against his assertions of aggravation in

1933, against the testimony of competent and disinterested witnesses who negative the accusation of negligence upon appellant's part, against Dr. McClain's testimony that appellee, when attended at the hotel immediately after the incident, "Smelled pretty strong of whiskey, talked a little like a drunk man, and had all the movements of a drunk man"; against Dr. McClain's statement that appellee, when driven home, got out of the car unaided and walked up an embankment to his home—in utter disregard of everything suggested by reason and common sense in connection with the affair—we, as members of the appellate court, recline supinely behind a judicial dogma and permit a scandalous miscarriage of justice to be consummated by virtue of a jury's apparent acceptation of testimony so glaringly insufficient as to shock the sensibilities of thinking people.

As was stated by Mr. Justice RIDDICK in *Singer Manufacturing Co. v. Rogers,* 70 Ark. 385, 67 S. W. 75, 68 S. W. 153: "The rule established in this court is that, even where there may be some conflict in the evidence, a new trial will be granted where the verdict is so clearly and palpably against the weight of evidence as to shock the sense of justice of a reasonable person; and the evidence here, we think, calls for this application of this rule."

In *Catlett v. St. Louis, I. M. & S. Railway Company,* 57 Ark. 461, 21 S. W. 1062, 38 Am. St. Rep. 254, Chief Justice COCKRELL said: "The test is as follows: After drawing all the inferences most favorable to the verdict that the evidence will reasonably warrant, is it sufficient in law to sustain the verdict?"

These declarations of law as approved by the entire court were discussed in a dissenting opinion written in the case of *Seaman Store Company v. Bonner,* 195 Ark. 563, 113 S. W. 1106. In commenting upon the action of a majority of the court in sustaining an unusually large personal injury verdict, the writer there said: "We are no longer shocked. We employ the verdicts of juries as shock absorbers. Certainly no one questions the jury's

exclusive right to pass upon the truth of controverted issues of fact. But it does not follow, because juries have this right, that they have the right also to return any verdict which fancy, passion or prejudice may suggest.

"The rule has been too often announced to be questioned that the verdicts of juries will not be disturbed on account of a finding of fact where there is substantial evidence to support that finding. Our reports are full of such cases, of which I have written a number, and I do not inveigh against or question them. But it does occur to me that there is a growing inclination on our part to shirk our responsibility in reviewing jury trials. We are becoming too prone to wash our hands of responsibility by saying that while a particular verdict should not have been returned and that our own sense of fairness and justice is such that we would not have done so, yet we are concluded by the verdict of the jury.

"The rule is firmly fixed by the numerous decisions of this court that we may not reverse a judgment as having been rendered upon insufficient testimony where the verdict upon which the judgment was rendered is supported by substantial testimony. . . .

"But are we without power to review this testimony? Have we no function to perform in passing upon its legal sufficiency to support a verdict which may have been, and in many cases is, returned, not by the unanimous vote of the jury, but by the vote of only three-fourths thereof? I say we have a duty, of which we are not relieved by the fact that a verdict has been returned. On the contrary, this duty is not imposed upon us until we are called upon to review that verdict. We then have that duty to perform, and can only discharge it by determining, as a matter of law, whether there is a failure of proof or whether the evidence is legally sufficient to warrant the verdict."

The writer of this opinion adheres to the view (presented by a philosophy often discussed but seldom analyzed) that human rights are paramount to property rights; and in litigation where these rights are in conflict, sympathy for the so-called "under dog" invariably

suggests restitution or compensation in favor of the plaintiff where a doubt exists as to relative issues. This adherence to a philosophy of right, however, does not go to the extent of sanctioning perjury and wrecking the rules by which society is maintained in order that one who suddenly finds himself in misfortune may place his hands in the pocket of another and help himself to the abundance he conceives to be deposited there.

It is my view, concurred in by Mr. Justice McHaney and Mr. Justice Holt, that the instant case is without merit. The judgment should be reversed and the cause dismissed.