SINCLAIR REFINING COMPANY v. HENDERSON.

4-5305                                        122 S. W. 2d 580

Opinion delivered December 12, 1938.

*V. R. Tomlinson, Ingram & Moher* and *John E. Coates, Jr.,* for appellant.

*A. G. Meehan* and *John W. Moncrief,* for appellee.

GRIFFIN SMITH, C. J. Judgments aggregating $25,000 based on jury verdicts, were entered against Sinclair Oil Refining Company and Harry E. Brown in consequence of injuries resulting in the death of Mrs. Mamie Henderson.

A five-gallon can of liquid thought to be kerosene was delivered by appellants to the Henderson home. It is alleged that through negligence a more inflammable liquid—one containing from fifteen to twenty per cent. gasoline—was supplied. Mrs. Henderson undertook to light a fire by using the supposed kerosene. There was a violent explosion, as a result of which Mrs. Henderson sustained burns causing her death the following day.

The fifty-three assignments of errors brought forward in appellants' motion for a new trial are treated under six headings: (1) The trial court erred in refusing to direct verdicts for appellants. (2) Appellants, being distributors, would not be liable unless they knew, or by reasonable care should have known, that the car of kerosene had been adulterated, since there had been official inspection at point of shipment. (3) The four separate judgments do not conform to the verdicts. (4) The judgments are excessive. (5) The court erred in refusing to declare a mistrial when appellees' counsel read to the jury appellants offer to confess judgment for a nominal sum. (6) The court erred in refusing to dismiss as to Orin M. Henderson as next friend.

Orin M. Henderson is a farmer, residing in Arkansas county, near Stuttgart. Mrs. Henderson was injured about five o'clock the morning of April 24, 1937—Saturday. She had arisen without disturbing her husband or either of the three children. Her only explanation of the accident was: ''I struck a match and the thing blew up.''

It is admitted by appellants that deliveries of distillate and kerosene were made to the Henderson home the afternoon of April 20—Wednesday.

Brown testified the delivery truck contained three compartments. The middle and back compartments were filled with distillate. The front compartment contained kerosene. Carl Garrich and R. G. Cruger accompanied witness to the Henderson farm. Brown told Garrich to unload the distillate. This was done through use of a hose several feet long. Garrich filled Henderson's "skid tank" and put an additional quantity in barrels. Brown says he saw Garrich "finish the remainder of the tractor fuel in the first compartment and drain it into a bucket and pour it into the barrel." Mrs. Henderson then came and wanted kerosene, pointing to a can. She asked that it be put on the back porch of the residence. Garrich emptied the Henderson can of some liquid he thought was water. Brown insists he cautioned Garrich to "be sure about it." After emptying the can Garrich hung it to the rear knob on the faucet and filled it directly from the tank. When the kerosene was drawn the hose was still attached to the other spigot, running distillate. Brown also stated that in filling the five-gallon can, Garrich had to shut off the faucet several times "because kerosene will foam."

Garrich testified he fastened the hose to the middle faucet to drain the rear tank, then changed to the left faucet, which was attached to the middle tank. "A little distillate was in the back tank that would not run out by gravity and we had to bucket that out. . . . We carry a five-gallon can or bucket for that purpose. Then I fastened the hose to the faucet on the left side and started running the distillate into the barrels." Garrich told of Mrs. Henderson's request for kerosene; of procuring the five-gallon can, and of emptying from it what he supposed was water. He was positive the hose was connected to the left distillate faucet when the five-gallon can was filled. In speaking of the can, Garrich said: "It was sort of a white, clear galvanized can, and not the red can in the courtroom. . . . After I filled the five-gallon can with kerosene I set it on the rack of the truck and went on emptying the rest of the distillate. We put the five-gallon can on the truck and drove out of the barn. I picked up the can and set it on the porch. I did not notice any other can on the porch."

A witness for plaintiffs testified that he had formerly worked for Brown; that all three tanks on the truck were sometimes used for tractor fuel (distillate), and "one time all three were used for gasoline. . . . I have seen tractor fuel come out [of the tanks] with the coal oil in flushing the compartments."

On behalf of appellees, Ozell Roe, a neighbor, testified she remembered the occasion when Mrs. Henderson procured five gallons of kerosene from the Sinclair Company, and that it was Wednesday; also, Mrs. Henderson bought a gallon of kerosene in Stuttgart on Tuesday. The witness borrowed a baking can full of kerosene from Mrs. Henderson on Thursday. The supply was taken from the one-gallon can. Witness had observed a half gallon fruit jar on the Henderson ice box. It contained gasoline. The jar lacked 1½ or 2 inches of being full. Witness "believed" she had seen the five-gallon can exhibited at the trial—"it is the one Mrs. Henderson used for coal oil."

After accompanying Mrs. Henderson to the hospital on Saturday, witness returned home Sunday. "There was a coal oil can in the Henderson home when I got there Sunday. I put it on the inside of the kitchen. I had the key to the house, locked the door, and nailed up the screen window on the back porch. I was at home from that time on until the can was removed from the house, except on Tuesday. . . . There was nothing to indicate that anybody had entered the house after I locked it. . . . A can of oil was taken away from the Henderson home about three and a half weeks after the death of Mrs. Henderson. Some strangers took it away and Mr. Orin Henderson was with them. I opened the door for them."

On cross-examination Mrs. Roe reiterated that the gallon of kerosene procured in Stuttgart by Mrs. Henderson was purchased on Tuesday before the Saturday accident. Witness was present when Mrs. Henderson brought it home: "She poured some in that can I was telling you about—that baking powder can for me— some in her lamp, and some in her oil stove. She had three stoves in the house, a wood stove, a cook stove, and

an oil stove. The heating stove was in the living room where the accident occurred. There was a pump engine run by gas. It was pretty close to the tool kitchen door. Mrs. Henderson and I were going to wash some quilts on Saturday morning. We were going to use the washing machine. It was driven by gasoline and was on the back porch. The gasoline was kept in the regular gasoline barrel in the tool shed about 150 yards from the house. The gasoline we were going to use in the washing machine was sitting on the ice box on the back porch. It was brought to the house Friday afternoon. . . . Some people representing the Sinclair Refining Company came out to the Henderson place before Mr. Henderson got out of the hospital. They wanted some coal oil. . . . That was after Mr. Brown had been out there on the previous Saturday. . . . I put the five-gallon can of kerosene in the kitchen and locked the house. Nobody put anything else in that can before it was taken away.''

Jim Cubit, a neighbor, arrived at the Henderson home soon after the explosion. He testified: ''I noticed the heater. The front door was swinging open. . . . If there had been a fire in the stove I couldn't tell it. Five or six small sticks like kindling wood were in the stove, but they were not burnt. The wood in the stove was kind of smoked black. It was scorched. I don't think there were any coals in the fire. . . . I found a gallon can with the bottom blown out.''

Allen Henderson testified that the day the accident occurred he took a fruit jar lid ''and poured out a couple of spoonfuls of the contents of the [five-gallon] can, and walked out into the yard, set the lid on the ground and lit a match. The wind blew it out. I only had two matches and the wind blew them both out, and I didn't do anything with it.''

Orin Henderson testified that after remaining in the hospital fifteen days he went to his father's home. With two friends he got the five-gallon can and took it to Dr. Manglesdorf, state chemist. He had not seen the can from the date of the accident until it was procured when the trip was made to Little Rock. From the weight of the can, he judged a gallon or a gallon and a half of the

contents had been taken out. Dr. Manglesdorf said he was not allowed to make tests for private individuals, but suggested that a chemist be procured.

Orin Henderson further testified: "On the Saturday morning of the accident the contents of the one-gallon can had come out of the five-gallon can. I generally always build the fire, and on Friday morning the little can was sitting by the cook stove or wood range. It had a very small amount of kerosene in it. . . . I drained what there was in the little can and then built the fire. The one-gallon can was empty and I poured what I thought was between one-half and three-quarters of a gallon from the five-gallon can sitting on the porch. . . . There was not any other kerosene on the place except that purchased from the Sinclair Refining Co. . . . My best judgment is that we had not had any fire in the heater for about a week."

The Memphis chemist who made tests said: "I feel perfectly safe in saying that between 15 and 20 per cent. of the material in that mixture would have passed a gasoline distillation test. In a mixture of gasoline and kerosene there would be a vapor from the gasoline. . . . If that liquid contained from 15 to 20 per cent. gasoline the contents could not be detected by smelling it. . . . The stream of gasoline coming out of the spout [of a can] gives off a vapor where the temperature is considerably hot—such as over a stove where you are starting a fire. It takes a considerable length of time to warm up the fluid in the can in order to make a vapor or formula that will ignite."

Appellants' testimony included Brown's statement that he went to the Henderson home the afternoon of the day of the accident and in the presence of a member of the Henderson family took a gallon sample from the five-gallon can. The can was still on the porch. The sample smelled and foamed like kerosene, and "everybody there agreed that it was kerosene." The specimen was brought to the Stuttgart bulk plant in the presence of witnesses, then taken to the city clerk's office with instructions that it be put in a vault. A representative of the Sinclair Company got the sample about five days

later and delivered it to Mr. Lyons. Lyons testified that in April, 1937, he delivered three samples to Dr. Manglesdorf. They were in gallon bottle jars and were given him by Harry Brown. Manglesdorf testified the samples were coal oil and conformed to state laws.

██ Appellants rely upon *Pierce Oil Corporation v. Taylor*, 147 Ark. 100, 227 S. W. 420, where, with facts somewhat similar to those in the instant case, it was held there was no presumption of negligence.[1] In the Taylor Case, however, recovery was permitted by reason of evidence tending to show that the so-called kerosene sold by defendant "would light more quickly and burn brighter" than ordinary kerosene.

If appellees relied entirely upon the negligence of Brown in failing to inspect the car of kerosene which appellants' evidence shows was sold to the Sinclair Company by the Root Petroleum Company, and by the latter shipped to Brown, for the account of the Sinclair Company, their insistence that no presumption of negligence attached would be sound, for there is nothing in the evidence to show that the odor or color or consistency of the kerosene was such as to put the dealer on notice. It was shown that other customers in and around Stuttgart whose orders were filled from the same supply received genuine kerosene.

---

[1] In the Taylor Case the court said: "The testimony adduced by defendant tended to show that the oil was tested in the tanks before shipment to Ozark and also after it was received at Ozark and found to be kerosene up to the standard required by law, and that the barrels of fluid sold to Plugge Bros. were taken from the tanks of oil thus tested and found to be in accordance with the requirements of the statute. The testimony in addition to that introduced in the trial in the Federal court was concerning the test made of the tanks of oil before shipment to Ozark. That testimony merely added to the volume of evidence in favor of the defendant, but did not eliminate the conflict in the testimony as to the fact that defendant, through its agents, furnished oil as kerosene which proved to be either gasoline or some other oil more inflammable than kerosene. We are of the opinion that the evidence was sufficient to show that defendant's agents were guilty of negligence in furnishing oil dangerous and unfit for use and which was not in fact kerosene of the standard required by law."

Appellees, however, have offered substantial evidence that the one-gallon can was filled from the five-gallon supply; that Mrs. Henderson was injured when the smaller can exploded; that there was no fire in the stove, or hot ashes, or coals, nor sufficient heat to have ignited kerosene within the one-gallon can; that distillate and kerosene were being drawn from the same tank truck in circumstances from which the jury could infer that a mistake was made in filling the five-gallon can, and that distillate or a diluted kerosene was in fact supplied. It is true Garrich testified a mistake was not made; but he also testified that "a little distillate was in the back tank that would not run out by gravity, and we had to 'bucket' that out." Just what the witness meant by this statement is not quite clear. In appellants' abstract of Garrich's testimony there is this quotation: "A little distillate was in the back tank that would not run out by gravity and we had to take it out with a five-gallon can." If the bucket to which reference was made by Garrich was, in fact, a five-gallon can, it would have been an easy matter for this container to be substituted for the five-gallon can of kerosene for delivery to the Henderson porch.

The transactions and attending circumstances do not present a situation where, as a matter of law, it can be said that it was impossible for an error to have been made in attempting to draw the kerosene.

Cases cited by appellants[2] are applicable to the facts to which the decisions were applied, but are not conclusive here.

■ The four separate verdicts rendered were: (1) For Allen Henderson as administrator, $2,500. (2) For Allen Henderson, administrator, and Orin M. Henderson, $6,000. (3) For Orin M. Henderson individually, $1,500. (4) For Allen Henderson, administrator, and Orin M.

---

[2] *Kroger Grocery & Baking Co.* v. *Melton*, 193 Ark. 494, 102 S. W. 2d 859; *Walloch* v. *Heiden*, 180 Ark. 844, 22 S. W. 2d 1020; *Goode* v. *Pierce Oil Corp.*, 171 Ark. 863, 286 S. W. 1009; *Magnolia Petroleum Co.* v. *Bell*, 186 Ark. 723, 55 S. W. 2d 782; *Biddle* v. *Jacobs*, 116 Ark. 82, 172 S. W. 258; *Fort Smith Light & Traction Co.* v. *Cooper*, 170 Ark. 286, 280 S. W. 990; *Mo. Pac. Rd. Co.* v. *Baum*, 117 S. W. 2d 31, 196 Ark. 239, 117 S. W. 2d 31.

Henderson as next friend for the benefit of the children, $15,000.

The administrator is the father of Orin M. Henderson, and grandfather of the minor children. Verdict No. 1 awarded him as such administrator $2,500. This recovery compensated damages for the benefit of Mrs. Henderson's estate for physical pain and mental anguish. That this was the jury's intention is affirmed by the special verdict forms submitted, and the judgment for $2,500 is responsive.

Verdict No. 3 is for the benefit of Orin M. Henderson, to compensate physical injuries he personally received.

Verdict No. 4 is in response to the special form: "If you find for plaintiffs for the use and benefit of Loretta Gay Henderson, Bobbie Joe Henderson, and Paul James Henderson, the form of your verdict shall be [as set out]." The jury's intention, by this verdict, was that the recovery should be for the children, all of whom were included. These minors sued by their father as natural guardian and next friend, but the administrator also sued in the same action. The court did not err in entering judgment on this verdict.[3] The administrator was the proper party to sue, and the verdict was in his favor.

---

[3] *St. Louis I. M. & S. Ry. Co.* v. *Prince*, 101 Ark. 315, 142 S. W. 499. This appeal involved two causes, one brought by John A. Prince as administrator of his wife's estate, and the other by Prince in his individual capacity to recover damages for injuries to his person and property, and also for the loss of the services and companionship of his wife. The suits were consolidated. The administrator recovered $10,000 for the benefit of the estate and next of kin of the wife. At page 325 of the opinion it is said: "The elements of damages embraced in the verdict in that case consisted of the physical and mental pain and suffering of the wife and also of the pecuniary loss of the next of kin, sustained by her death. The next of kin were four little girls, aged, respectively, 10, 8 and 6 years, and 8 months. The mother was 31 years of age, strong in body and vigorous in mind. She was devoted to her children, and provided in a large measure for their wants and comforts. She was of industrious habits, good character and a dutiful parent. It has been held that the loss to minor children of the instruction and the physical, moral and intellectual training by a parent is a proper element to be considered in estimating the damage to the children by reason of such parent's wrongful death." (See cases cited.)

The special form was submitted to the jury without objection from appellants. The court's judgment was for the administrator, to the exclusion of the father.

Verdict No. 2 is inconsistent and the judgment is inherently wrong. It awarded Allen Henderson, administrator, and Orin M. Henderson, $6,000. It is true the special form to which the jury responded with Verdict No. 1 limited the award to the administrator to elements arising from physical pain and mental anguish suffered by Mrs. Henderson. The husband's damages for loss of companionship, and also expenses of the estate for medical care, funeral costs, etc., were not enumerated. The special form submitted was: "If you find for plaintiffs, Allen Henderson as administrator of the estate of Mrs. Mamie Henderson, deceased, and Orin M. Henderson, because of the damage, if any, proximately suffered by Orin M. Henderson, if any, because of the injuries and death of his wife, the form of your verdict shall be . . ."

After the verdicts had been returned the court held that the administrator had joined the husband in the suit in the capacity of a trustee,[4] as shown by footnote.

It is our view that the interests of husband and administrator did not create the relationship of trustee and beneficiary, and this judgment must be reversed. The

[4] The order of the court was: "Allen Henderson, administrator of estate of Mrs. Mamie Henderson, deceased, joined with plaintiff Orin M. Henderson in his action for damages for wrongful death of his wife, Mamie Henderson, resulting in loss of services and companionship or help of the wife, Mamie Henderson; and this was done by said Allen Henderson, as administrator, in capacity of and as trustee for Orin M. Henderson and for the benefit of Orin M. Henderson but the court finds and declares that the aid and presence of Allen Henderson, administrator of the estate of the wife of Orin M. Henderson, is unnecessary and the presence or aid of said Allen Henderson in capacity as such trustee for Orin M. Henderson is not essential to Orin M. Henderson, nor to the prosecution by Orin M. Henderson of his action for damages for the wrongful death of his said wife. And the said Allen Henderson, administrator, is excluded and removed from the cause and action and proceedings of and by and for Orin M. Henderson against defendants because of the wrongful death of his wife and the consequent loss of her services, companionship and help."

administrator, as such, could sue for the estate. The husband could be joined in the action in order that he might recover whatever damage he had sustained through loss of his wife's companionship, etc., but interest of the administrator and interests of the husband were different. It was not the duty of the administrator to sue for damages sustained by Orin M. Henderson. Inclusion of the administrator in the special form was misleading and the error could not be cured by the court's judgment finding that in fact the administrator was trustee.

■ The judgments are not excessive. Mrs. Henderson was horribly burned and suffered excruciating agonies. Relief through death did not occur for thirty hours. Cases cited by appellants[5] showing recoveries of smaller sums in suits where facts are somewhat analogous are not authority for the proposition that if larger recoveries had resulted the appellate court would have reduced them.

■ In addressing the jury, one of counsel for appellees said: "I believe, in this opening statement, I could do no better than to begin by reading to you the pleadings—complaint and answer in full, so you may understand the questions in issue." The complaint and amendments were then read, and counsel remarked: "And now, gentlemen of the jury, so you may understand exactly the points in issue, the defendant makes and files this answer."

No objection was made by appellants when it was stated that the pleadings were to be read. The answer contained an offer in the nature of a compromise by payment of $50.[6]

[5] *Singer Mfg. Co.* v. *Rogers*, 70 Ark. 385, 67 S. W. 75, 68 S. W. 153; *Houston Oil Co.* v. *McGuire*, 187 Ark. 293, 59 S. W. 2d 593; *St. Louis, etc., Ry. Co.* v. *Prince*, 101 Ark. 315, 142 S. W. 499; *St. Louis, etc., Ry. Co.* v. *Adams*, 74 Ark. 326, 85 S. W. 768, 86 S. W. 287, 109 Am. St. Rep. 85.

[6] That part of the answer pertinent here is: "Defendants deny that they are liable to the plaintiffs in any sum whatsoever. But, in order to stop this litigation the defendants here and now offer to confess judgment by way of compromise, in favor of plaintiffs in the sum of $50, plus all costs accrued to date, on condition that said offer be accepted before further costs accrue; otherwise, the defendants will insist that they are under no liability herein."

Appellants moved for a mistrial. There was no error in overruling the motion. Although that part of the answer making the compromise offer ought not to have been read to the jury, yet appellants knew what their answer contained; knew that if it should be read the compromise offer would be brought to the jury's attention. Objection should have been made when it was stated the answer would be read. This might properly be termed a negatively invited error, and is not controlled by the cases cited. [7]

■ We have discussed, *supra*, the right of the father as natural guardian and next friend of the minor to sue in their behalf. It is not inappropriate in this opinion to say that the practice of submitting special interrogatories and requiring special verdicts—particularly in cases similar to the instant one—should be encouraged.

Judgment No. 2 is reversed. As to other recoveries aggregating $19,000, the judgments are affirmed.

[7] Cases cited by appellants in support of their contention that it was error for the defendant to read the answer are: *Bates* v. *Blocker,* 175 Ark. 891, 1 S. W. 2d 11; *Geyer* v. *Western Union Tel. Co.,* 192 Ark. 578, 93 S. W. 2d 660; *Tri-State Transit Co.* v. *Miller,* 188 Ark. 149, 65 S. W. 2d 9, 90 A. L. R. 1389.