St. Louis-San Francisco Railway Company, Thompson, Trustee, *v.* McCarn.

4-8318                      205 S. W. 2d 704

Opinion delivered November 10, 1947.

Rehearing denied December 8, 1947.

288

*E. G. Nahler, E. L. Westbrooke, Jr.,* and *E. L. Westbrooke,* for appellant.

*Bruce Ivy* and *Myron T. Nailling,* for appellee.

HOLT, J. Appellee, the father of Raymond McCarn, 17 years of age, sued appellant, Railroad Company, for damages to compensate him for loss of contributions in the death of his son, which resulted from a collision between appellant's freight train and an automobile in which Raymond was riding, and belonging to appellee, on a street crossing in Luxora, Arkansas.

Appellee alleged in his complaint, negligence of appellant in failing to give the statutory warning signals (§ 11135, Pope's Digest).

Appellant's answer was a general denial and affirmatively pleaded that the collision resulted solely from the negligence of appellee's son, Raymond, and Junior Graves who was the driver of the car.

A jury awarded damages in the amount of $4,000, and from the judgment comes this appeal.

For reversal, appellant first questions the sufficiency of the evidence to support the verdict. No complaint was

made as to the instructions except the court's refusal to direct a verdict for appellant.

In determining whether there was substantial evidence to support the verdict, we must view it in the light most favorable to appellee.

The collision occurred about 1:30 Sunday afternoon, February 28, 1944. It was cloudy and misting rain. Appellee's son, Raymond, along with four other boys, whose ages were from 16 to 19, were in the automobile when the collision occurred. Junior Graves was driving and Raymond was sitting by his side on the front seat. The automobile was a 1931 Chevrolet sedan in good repair.

The boys drove easterly on Calhoun Street to the crossing, in question, at a speed of from fifteen to twenty miles per hour. The train, a local freight consisting of seven cars and the engine, was moving about fifty miles per hour when the collision occurred. On their left, or north side of Calhoun Street, before the boys reached the crossing, there were several obstructions, including a filling station, a story and a half dwelling house, a shed and a garage. Back of the shed and further to their left, facing and bordering the right of way, was a section foreman's house, in front of which were several trees which tended to obstruct the view. There was also a number of telephone or telegraph poles along the railroad right of way. The one and a half story house was approximately 100 feet west of the crossing and the garage approximately 88 feet. These obstructions were on their left or north, the direction from which appellant's train was coming. On account of the obstructions, the evidence tended to show that the driver of the automobile could not see the track any appreciable distance north, or to his left, until he had reached a point 88 feet from the crossing.

There was affirmative testimony which, however, was not undisputed, to the effect that the whistle was not blown nor was the bell rung, until the collision occurred.

As a result of the collision appellee's son, Raymond, and two of his companions were killed instantly. The train ran approximately 1,000 feet after striking the automobile before it was stopped.

J. D. Betterton, 19 years of age, one of the boys who survived the collision, testified: (Here we quote from appellant's brief.) "Junior Graves was driving. I was the last one to get in it; sat on left end of rear seat; we started to Luxora, Junior Graves driving; Shannon Graves and Raymond McCarn were on front seat, Raymond McCarn in the middle, Shannon Graves on right end of front seat. We were driving to Luxora on Highway 61; it was misting rain, the concrete pavement wet. We were all talking and driving 20 or 25 miles an hour. Couldn't see anything until we got to those trees and along up there a train was coming. We tried to get out of the car. The driver started stopping the car, but it was so close on him he couldn't stop it and the train hit the car. We looked both ways when we got around the trees and the house on the left of the highway and saw the train and started to get out. When I saw the train it was right on us. Whistle wasn't blowing, bell not ringing until about the time it hit the car. . . .

"I looked for a train after we got around the trees. We were making around fifteen miles an hour I imagine when we went on the track. Have seen many trains running over this crossing and a train may come along at any time. We slowed down for the crossing. The front wheels were not quite on the track when I saw the train. I know all of us looked for the train. . . . As soon as we saw the train everyone tried to avoid the accident. The train was right on us when we got to the track and I hadn't seen it before."

The other survivor, Shannon Graves, 17 years of age, testified that he was in the front seat on the right. His brother was driving. "When we saw the train my brother did everything he could to stop"; that the car was practically stopped when they got on the track and that his brother began to slow down to go over the cross-

ing. He was asked: "After you—now, I believe you say after you passed by the 'Y' there, going on to the track, or up to where you come to the house and trees you say you passed out from, was there any way for you to know that there was a train coming unless the bell had been ringing or the whistle blowing? A. No, sir. Q. You couldn't see the train in that position? A. We couldn't see, it was blind. Q. Do you state positively that when you saw the train coming that the bell was not ringing and the whistle was not blowing? A. I am positive."

We deem it unnecessary to detail all of the evidence. It suffices to say that we have carefully reviewed it and have reached the conclusion that a case was made for the jury.

If it be conceded that the evidence showed that the driver of the car in which appellee's intestate was riding was guilty of negligence, we are also of the view that the evidence shows that the Railroad Company was also guilty of negligence. A situation was therefore presented in which it became necessary for the negligence to be compared. The jury was instructed:

"If you find from the evidence in this case that the collision was the result of the failure of defendant's employees to give the statutory signals by ringing the bell or blowing the whistle as the law directs, your verdict should be for the plaintiff, unless you further find that the driver of the car was guilty of some negligence that caused or contributed to the injury complained of, and that his negligence was equal to or greater than that of the trustee, his agents, servants and employees. If you find that the driver of the car was guilty of some negligence that contributed to the injury complained of, but that his negligence was of less degree than that of the trustee, if any, then the amount of recovery should be diminished in proportion to such contributory negligence."

If it be said that the evidence was sufficient to apply the rule of imputed negligence to appellee's intestate, still the jury necessarily, under the instruction, must have

found that the negligence of the driver of the car was less than, or did not equal that of the Railroad Company.

In view of the instruction, *supra,* which was not unfavorable to the Railroad Company we do not consider whether, at a given point either as to distance or time before the driver of the automobile reached the crossing a duty rested upon appellee's intestate to warn the driver of danger.

In the very recent case of *Smith, Administratrix,* v. *Missouri Pacific Railroad Company, Thompson, Trustee,* 208 Ark. 40, 184 S. W. 2d 951, a railroad company crossing case where a freight train collided with a truck in a situation similar to that presented here, and the primary question was whether the statutory signals were given, we there said: "Here the whistle was not blown, nor was the bell rung. The approaching train, of course, made considerable noise which the intestate could have heard had he listened, just as he could have seen the train had he looked, but the statute imposes upon all railroads the duty of giving notice of the approach of a train to a crossing by blowing the whistle or ringing the bell ' . . . at a distance of at least eighty rods from the place where the said road shall cross any other road or street.' Section 11135, Pope's Digest. . . .

"A note of the bell, or a blast of the whistle would have given intestate the warning which the statute requires, and might have awakened him from his lethargy and averted the collision inasmuch as he was approaching the track not directly, but at an angle of 45 degrees, which to that extent diminished the range of his vision, and while this did not lessen his duty to look, it did make looking less effective," and it was there held (headnote 4): "Since there is room for an honest and intelligent difference of opinion as to the degrees of negligence on the part of the parties, the jury should have been permitted to compare this negligence under an instruction requiring the damages to be reduced in the proportion which the negligence of appellant's intestate bore to the negligence of appellee."

So here, the driver of the automobile was approaching the crossing at a speed of about fifteen miles per hour with his view to the left or north, the direction from which the train was approaching, obscured by the many obstructions above mentioned, and had either of the statutory signals been given, he might have been warned of the fast approach of the train in time to have stopped the car and avoided the collision.

Finally, appellants argue that the verdict was excessive. We cannot agree.

Appellee's son was at the time of his death a little over seventeen years of age and lived at home assisting his father run his 40-acre farm, doing the usual duties and chores required of a farm hand. There was evidence that it would cost appellee $2.50 a day to replace the services of his son. Raymond worked for his father an average of four days per week. During 60 days of the cotton picking season, Raymond averaged about 325 pounds per day, four days per week, picking cotton. He averaged about $7.50 per day. He was a dutiful son, bright and healthy. The appellee estimated his son's services to be worth $1,000 per year to him. He was the youngest child and had never expressed any intention of leaving home.

As has many times been said, there is no certain yardstick by which to measure the value of the loss of services in a case of this nature. Necessarily, the recovery must depend largely upon the facts presented in each case.

In *Missouri Pacific Transportation Company* v. *Parker, Admr.*, 200 Ark. 620, 140 S. W. 2d 997, we said: "The recovery of damages for the pecuniary loss sustained by a parent for the wrongful death of a minor child and the amount of such recovery have been the subject of numerous decisions of this court. We think it would be a work of supererogation to review and attempt to apply or distinguish principles to or from the case at bar. Those interested in the subject may find them reviewed and applied in *Morel* v. *Lee*, 182 Ark. 985, 33 S. W. 2d 1110, where a verdict was reduced to $2,500 for the

death of a four-year-old child; in *Chapman* v. *Henderson*, 188 Ark. 714, 67 S. W. 2d 570, where a verdict for $7,500 was sustained for death of a 20-year-old son who earned $5.50 per day and was the sole support of his mother; in *Davis* v. *Gillin*, 188 Ark. 523, 66 S. W. 2d 1057, where a verdict for $12,500 was reduced to $2,500 for the death of a six-year-old child; in *Ark. P. & L. Co.* v. *Hoover*, 182 Ark. 1065, 34 S. W. 2d 464, where a verdict for $10,000 was reduced to $5,000 for the death of an adult son; in *Ark. P. & L. Co.* v. *Adcock*, 184 Ark. 614, 43 S. W. 2d 753, where a verdict for $2,500 was reduced to $2,000 for the death of a 17-year-old son; in *Mooney* v. *Tillery*, 185 Ark. 457, 47 S. W. 2d 1087, where a verdict for $1,500 for a 22-year-old son was sustained; and many other similar cases cited in the cases mentioned. The amount of the recovery is necessarily speculative. No one can know or testify what the value of the services of a minor child, less its necessary expense, will be."

So here, we are unwilling to say on all the evidence presented that the jury's award of $4,000 is excessive.

On the whole case, finding no error, the judgment is affirmed.