St. Louis-San Francisco Railway Company,
Thompson, Trustee *v*. Perryman.

4-8400                                   211 S. W. 2d 647

Opinion delivered May 24, 1948.

Rehearing denied June 21, 1948.

*E. G. Nahler, Paul E. Gutensohn* and *Warner & Warner,* for appellant.

*Partain, Agee & Partain,* for appellee.

ED. F. McFADDIN, Justice. This appeal stems from a grade crossing collision between a railroad engine and an automobile, the latter occupied by six boys.

On Sunday morning, June 23, 1946, the six boys drove in a 1936 two-door Ford sedan to a swimming hole on Frog Bayou in Crawford county. The car was owned by a member of the family of Roosevelt Foster, one of the boys, and he had invited the other five to go with him. On their return trip, and while Roosevelt Foster was driving, there occurred the grade crossing collision which resulted in the death of one of the boys (Tommy Perryman, aged 14), and the injuring of Roosevelt Foster, aged 16, and Voile Ray Aldridge, aged 13. These three boys were in the front seat of the car. Insofar as the record here shows, the three boys in the back seat were not injured. They were Lawrence Perryman, aged 16; William Thacker, aged 16; and Bennie Jean Perryman, whose age is not stated.

Three actions [1] filed against the St. Louis-San Francisco Railway Company (Frank A. Thompson, Trustee) were—by consent—consolidated for trial, and resulted in verdicts as follows:

---

[1] In one action the plaintiff was James T. Perryman as administrator; and also individually. In the second action the plaintiffs were Voile Ray Aldridge, by his father, and J. J. Aldridge individually. In the third action the plaintiffs were Roosevelt Foster, by his mother, and Mrs. Nancy Foster individually. In this third action George Foster and the Federal Union Insurance Company intervened.

1. James T. Perryman, administrator of the estate of Tommy Perryman, $25;

2. James T. Perryman, father of Tommy Perryman, for loss of services of the minor, $5,000;

3. Voile Ray Aldridge, for his pain, suffering and injuries, $10,000;

4. J. J. Aldridge, father of Voile Ray Aldridge, for loss of services of the minor, $1,000;

5. Roosevelt Foster, for his pain, suffering and injuries, $100;

6. Mrs. Nancy Foster, mother of Roosevelt Foster, for the loss of services of the minor, $400; and

7. The defendant railroad company, as against the interveners, George Foster and the Federal Union Insurance Company for damages to the car.

From an unavailing motion for new trial against the judgments on the first six verdicts, appellant brings this appeal. The briefs of both sides contain 465 printed pages, and the transcript contains 506 typewritten pages. We list and discuss appellant's argued assignments.

I. *Appellant Says, "No Actionable Negligence Was Proved, and Plaintiffs Were Not Entitled to Recover."* The only allegations of defendant's (appellant's) negligence relied on by the plaintiffs (appellee) were: (1) the failure to sound the bell or whistle, and (2) excessive speed of the train. Several witnesses testified that neither the whistle nor the bell was sounded for the crossing, as required by law. (§ 11135, Pope's Digest.) For instance, the disinterested witness, H. B. Simmon, testified:

"Q. Did you or not hear the train whistle at that time? A. No, sir, there was no train whistle at this crossing. Q. Were you near enough to hear one if it had whistled? A. Yes, sir. Q. And you state that it didn't whistle as it approached the crossing? A. No, sir. Q. Did you or not hear the bell ring? A. No, sir.

Q. You didn't hear a bell ring or a whistle blow? A. No, sir, I heard the engine puff.''

Jim Kinner, another disinterested witness, testified:

''Q. How far away would you say he whistled? From this crossing? A. Close to a half-mile. Q. Did the train ever whistle any more? A. No, sir. Q. Did a bell ever ring from that time on? A. No, sir. Q. If it had done so, would you have heard it or not? A. Yes, sir. Q. Did you see the train? A. Yes, sir. Q. I wish that you would tell the jury how fast that train was going. A. In my judgment it was running 50 miles an hour.''

Even if we disregard the evidence about the speed of the train, nevertheless, we must conclude that there was substantial evidence that the statutory signals were not given. But, says the appellant, failure to give the statutory signals was not the cause of the collision, because the boys could have seen and heard the train if they had looked or listened, and such knowledge would have made the signals unnecessary. On this point appellant cites and relies on such cases as: *Mo. Pac. R. Co.* v. *Hood,* 199 Ark. 520, 135 S. W. 2d 329; *Mo. Pac. R. Co.* v. *Dennis,* 205 Ark. 28, 166 S. W. 2d 886; *Mo. Pac. R. Co.* v. *Doyle,* 203 Ark. 1111, 160 S. W. 2d 856; *Mo. Pac. R. Co.* v. *Moore,* 199 Ark. 1035, 138 S. W. 2d 384; *Crossett Lumber Co.* v. *Cater,* 201 Ark. 432, 144 S. W. 2d 1074; and other earlier cases cited in those above listed.

Appellant's contention makes necessary a description of the highway and railroad track. For the purpose of this opinion, we treat the railroad track as running from south to north. The gravel highway from the south ran parallel and east of the railroad track to the crossing here involved, and then after a sweeping curve the gravel highway ran north, parallel to and west of the railroad track. The train was going from south to north, and the automobile was traveling from north to south. Thus, the car was approaching the crossing from the west, and struck the engine slightly back of the cowcatcher. Taking the route traveled by

the car from the swimming hole to the crossing, there was a long curve going south and east to the crossing. When the automobile was about 80 feet from the crossing, the highway ran practically due east to the crossing. Some evidence tended to show that from 50 to 65 feet west of the crossing there was nothing to obstruct the view, or to keep the boys from seeing the train as it approached from the south.

Did the boys in the car see and hear the train, or know of its approach so as to make the statutory signals unnecessary? It is claimed that Roosevelt Foster, driver of the car, on the day after the collision, gave a written statement to the railroad claim agent, which read in part:

"The road is of gravel and when around 400 feet west of the crossing, we were traveling east to the track and coming around the curve, and we were all talking and laughing about a ball game, proceeding about 15 miles per hour. I was looking to my left or the north as (I) came to the track and did not see or hear the train. I can see and hear good. The first I looked to my right or south, was when my car was about 15 feet from the track and had slowed the car down to 10 or 12 miles per hour. I then looked to my right and saw the train on the track and it was about 2 or 3 box car lengths south of the crossing. I went for my brakes, but they did not hold good and I then got the car in low gear, don't know whether I put it in reverse or not, but was doing this to get the car stopped."

But at the trial Roosevelt Foster repudiated this statement, and testified: "Q. As you approach that crossing state whether or not there was any interference with your view of the track: was there anything to keep you from seeing the track? A. Yes, sir. Q. What was it? A. A big sweet gum tree. Q. Was that on your right or left? A. It was on my right. Q. At that time it was to the south of you? A. Yes, sir. Q. Did you or not look down that way or attempt to look down that way? A. I looked. Q. Did you see any train or not? A. I didn't, I couldn't. Q. Was there anything except

the sweet gum to cut off your view? A. There were some sprouts. Q. Which direction were they from the tree? A. They were farther south. Q. Tell the jury whether or not you heard or saw any train coming? Did you or not look and listen for a train? A. Yes, sir.''

And, again:

''Q. Did you hear any train whistle as you approached the crossing? A. No, sir. Q. Did a train whistle as you approached the crossing? A. No, sir. Q. Did you hear a bell ring? A. No, sir.''

Furthermore, it is claimed that Voile Ray Aldridge gave a signed statement to the railroad claim agent some time after the collision, in which statement the following appears:

''As we approached the track, I don't know how fast we were moving, but we were all talking as going to have a ball game that afternoon. As we came to the track we heard, or I did, the train whistling, but I thought it was coming from the north, and I looked that way as coming to the track. The first I knew it was coming from the other direction was as our car got to the edge of the woods on west side of track and to our right—don't know how many feet back that is, but seemed pretty close to the track. I don't know just how far the train was to my right, but seemed awfully close to crossing. I don't recall whether anyone called to Rosie to stop or not, and don't remember whether I did or not. I don't recall hitting the train, and don't know where we hit it. I don't recall anything after that, as the next thing I knew I was in hospital at Fort Smith. I don't recall whether the bell was ringing or not, but did hear it whistling as we approached crossing, and thought it was coming from our left, or from the north.''

But at the trial Voile Ray Aldridge testified: ''Q. As you came to the crossing of the road with the railroad, did you or not hear a train whistle or a bell ring? A. No, sir. Q. Were you looking or listening, Voile Ray, or not? A. Yes, sir. Q. As you approached the crossing, did you or not have a clear view of the track, or

was there something to obstruct your view? A. There was a big sweet gum tree. Q. Were there leaves on the tree at that time? A. Yes, sir.''

Under this assignment appellant also argues that the cause of the collision was not the railroad's failure to give the statutory signals, but, rather, the absence of brakes on the car. The appellant introduced the alleged signed statement of Roosevelt Foster, in which this appears: ''I went for my brakes, but they did not hold good and I then got the car in low gear, don't know whether I put it in reverse or not, but was doing this to get the car stopped. I don't know where the train hit the car or where we hit the train. The brakes would hold part of the time, but would take some time to stop it.''

But, as before mentioned, at the trial Roosevelt Foster repudiated the signed statement, and testified that the brakes were working. This appears: ''Q. Don't you know that you put it in reverse because the brakes were not working? A. No, sir, they were working. Q. If anybody else says that they were not working, then they are just mistaken about it? A. Yes, sir.''

Furthermore, Voile Ray Aldridge was interrogated on cross-examination about the brakes, and gave answers as follows: ''Q. The brakes on that car were not very good? A. They were pretty good brakes. Q. Don't you know that you were having trouble with the brakes and the car wouldn't stop because it didn't have good brakes, don't you recall that? A. No, sir.''

It is thus clear that the testimony of the witnesses at the trial was a repudiation of their previous statements; and the testimony at the trial, if believed by the jury, was sufficient not only to repudiate the statements, but to establish that the boys did not know of the approach of the train until shortly before striking the engine; and also that a question of fact was presented as to the brakes on the car. See *St. L. S. F. Ry.* v. *McCarn*, 212 Ark. 287, 205 S. W. 2d 704. It is not for the judges of this court to determine whether the signed statements are more trust-

worthy than the testimony from the witness stand. That is a matter for the jury, which is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Mo. Pac. Transp. Co.* v. *Sharp,* 194 Ark. 405, 108 S. W. 2d 579; *Washington County* v. *Day,* 196 Ark. 147, 116 S. W. 2d 1051; and *Mo. Pac. Transp. Co.* v. *George,* 198 Ark. 1110, 133 S. W. 2d 37. In the early case of *Hynson* v. *Terry,* 1 Ark. 83, this court in the first year of our statehood said: "It is the province of the jury to weigh and compare the testimony and to apply the facts to the principles given them in charge by the court."

So, it is clear that the question, whether the failure to give the statutory signals was actionable negligence in this case, was a matter for the jury under the testimony as presented. It would serve no useful purpose to try to point out how the facts in this case differ from or agree with the facts in previous cases involving grade crossing collisions, because each case has its own peculiar set of facts. The pole star for this court on appeal is, whether there was substantial evidence to take the case to the jury on the question of actionable negligence. We have sketched here only a portion of the evidence, but a portion sufficient to show that a jury question was made on the issue of actionable negligence, *i. e.,* failure of the railroad to give the statutory signals as being the cause of the collision.

II. *Appellant Says, "The Driver and Occupants of the Car Were Guilty of Contributory Negligence, and Plaintiffs Cannot Recover."* This issue of contributory negligence of the boys is closely akin to the issue of the defendant's actionable negligence, heretofore discussed. The relationship of the two issues is this: contributory negligence, just as the actionable negligence of the defendant, is a question for the jury, if substantial evidence be introduced on such issue. Furthermore, in railroad crossing cases contributory negligence is not an absolute defense, but only a "measuring and reducing" defense. (Section 11153, Pope's Digest, as amended by Act 140 of 1945, and see cases cited in West's Arkansas Digest, "Railroads," § 350(13).)

In the present case the court submitted to the jury, in defendant's instructions 31 and 32, the question of whether the boys in the car were engaged in a joint enterprise, and the jury verdicts constitute a negative answer to that question. In this state of the record, there was no joint enterprise; and the negligence of the driver of the car is not imputed to the other occupants. *Mo. Pac. R. Co.* v. *Johnson,* 204 Ark. 604, 164 S. W. 2d 425; *Mo. Pac. R. Co.* v. *Henderson,* 194 Ark. 884, 110 S. W. 2d 516; *Hot Springs St. Ry. Co.* v. *Hildreth,* 72 Ark. 572, 82 S. W. 245; and other cases collected in West's Arkansas Digest, "Negligence," § 93. The only duty of the occupants of the car—other than the driver—was to comply with the ordinary "stop, look and listen" rule, as announced by our cases.[2] In *St. L. S. F. Ry. Co.* v. *Steele,* 185 Ark. 196, 46 S. W. 2d 628, we said, of a guest in an automobile approaching a railroad crossing: "The testimony showed that appellee was riding in the car with the Negro as a guest by his own invitation, it is true, but any negligence of the owner or driver of the car cannot be imputed to him, although he was bound to the exercise of ordinary care for his own safety under the circumstances, . . . ." See, also, 5 Am. Juris. 776, and cases there cited.

As previously mentioned, our comparative negligence statute (§ 11153, Pope's Digest, amended by Act 140 of 1945) provides that contributory negligence is not an absolute defense, but is only for proportional diminishing of recovery. So, even if the driver and occupants were guilty of contributory negligence, still, if the railroad company was guilty of actionable negligence greater than the contributory negligence, then it was for the jury to diminish the recovery in porportion to such contributory negligence. Whether the driver and occupants were guilty of contributory negligence, is a disputed question of fact under the evidence in this case, and was properly submitted to the jury. The language of Mr. Justice FRAUENTHAL in *Ark. Central Ry.* v. *Williams,* 99 Ark. 167, 137 S. W. 829, is apropos:

---

[2] See West's Arkansas Digest, "Railroads," § 327.

"But where the evidence is conflicting, the question as to whether or not the traveler at the public crossing did look and listen for an approaching train before reaching the crossing, and whether or not he did continue with vigilance and care until the point of danger was past, is ordinarily one of fact for the jury to determine. Unless the evidence is either uncontradicted or is indisputable, to the effect that he did not look and listen, the verdict of a jury finding that the traveler did so look and listen should not be set aside as a matter of law."

III. *Appellant Says, "The Verdicts Are Inconsistent and the Judgments Should Be Reversed."* Originally, Mrs. Nancy Foster, mother of Roosevelt Foster, claimed that she was the owner of the automobile that Roosevelt Foster was driving, and she asked damages in the sum of $400 for the car and $2,000 as damages for her loss of the services of the minor, Roosevelt Foster. Later, however, it developed that the automobile that Roosevelt Foster was driving was owned by his brother, George Foster, who had collision insurance on the car. Accordingly, George Foster and his insurance carrier (Federal Union Insurance Company) intervened in the case, and sought to recover from the railroad company the amount of the damages to the car. The jury returned a verdict in favor of the railroad company and against the said interveners. Because of this verdict, appellant argues that, since the owner of the car did not recover, there is therefore a conflict between the verdicts, and all the judgments should be reversed. To support such argument, appellant cites such cases as: *Mo. Pac. Ry. Co.* v. *Boyce,* 168 Ark. 440, 270 S. W. 519; *Muha* v. *De Luccia* (N. J.), 136 Atl. 332, 5 N. J. Misc. 274; and *Lanning* v. *Trenton Co.* (N. J.), 130 Atl. 44, 3 N. J. Misc. 1006.

But we think one reason that the jury returned the verdict against George Foster and the insurance company was because of the peculiar and misleading instruction given the jury at the request of said interveners. The instruction read in part as follows: "As to the automobile the intervener insurance company alleges, and the plaintiff George Foster concedes, that under the policy

written by it covering said vehicle, the said plaintiff has been reimbursed by said intervener in the sum of $260.50; so if you find for George Foster as to said property damage and further find that said damage, if any, amounted to as much as $260.50, then your verdict should be for the intervener for that amount. And if you find the damage to said property was more than the amount claimed by said intervener, then you may find for George Foster for such excess, if any, not to exceed the sum of $50.''

It was conceded in the evidence that George Foster was the owner of the car, but the amount of the damages was disputed, and under this instruction the jury was— in effect—told that, if the damages amounted to as much as $260.50, then the verdict would be for the intervener; and if the damages exceeded $260.50, then the excess, not to exceed $50, would go to George Foster. The jury might well have found from the evidence that the total damage to the car did not exceed $260.50; and in that event, could have returned a verdict against the interveners—under the wording of this instruction—without necessarily finding that the driver of the car was guilty of contributory negligence. Viewed in this light, the verdict against the interveners does not necessarily establish that the jury found that the driver of the car was guilty of contributory negligence; and this disposes of the argument about inconsistency in the verdicts as regards the point here argued.

IV. *Appellant Says, ''The Verdict in Favor of the Plaintiff, James T. Perryman, Is Inconsistent, and the Judgment for Him Is Inherently Wrong.''* One of the actions was by Perryman, as administrator of the estate of his son; and in this action there was a verdict for Perryman, as administrator, for $25. In the same action James T. Perryman, as father of the deceased minor, also sought damages for the loss of the services of the minor by reason of his death; and in that phase of the action there was a verdict for the father for $5,000.

The gist of the appellant's argument in this assignment is, that, since there was a verdict for Perryman as

administrator, it was therefore error to have a verdict for Perryman as father; because the administrator is the sole person who can maintain an action. Appellant cites and strongly relies on *Sinclair Rfg. Co.* v. *Henderson,* 197 Ark. 319, 122 S. W. 2d 580. In answer to the appellant's argument, appellee cites and relies on *Southwestern G. & E. Co.* v. *Godfrey,* 178 Ark. 103, 10 S. W. 2d 894. We think the case of *Sauve* v. *Ingram,* 200 Ark. 1181, 143 S. W. 2d 541, settles this issue in favor of the appellee. In the Sauve case Mr. Justice MEHAFFY pointed out that the presence of the father's name in the pleadings did not change any "claim or defense, and appellant could not possibly have been prejudiced thereby." So, here, appellant—in consenting to the consolidation of all of the cases —acknowledged that the designation of the father as such really meant that the administrator was acting for the benefit of the father, since the father was also the administrator. Therefore, the two verdicts really mean that the jury awarded $25 to the administrator for the estate, and $5,000 to the administrator for the benefit of the father for loss of the services of the minor. We will further discuss the amount of this verdict under Topic VI herein, but we overrule appellant's argument concerning inconsistencies in the verdicts.

V. *Appellant Says, "The Court Erred in Giving Plaintiffs' Requested Instructions."* The court gave 15 instructions for the plaintiffs and 24 instructions for the defendant; and the defendant made only general objections to plaintiffs' instructions. It would unduly prolong this opinion to set out all the instructions challenged, and to give in detail the reasons for our holding on each such instruction. We conclude that the instructions for the plaintiffs were not inherently erroneous, and were good as against general objections, which alone were offered.

VI. *Appellant Says, "The Damages Are Excessive."* We discuss the judgments.

A. There was a verdict for James T. Perryman for $5,000 for loss of the services of his minor son, Tommy Perryman, who was killed in the collision. The law does

not attempt to compensate parents for the grief and pain they sustain in the loss of a child. No amount of money could do that. What the law does—in the absence of a showing of reasonable expectancy of earnings after minority—is merely to compensate a parent for his monetary loss in being deprived of the earnings and services of the child during what would have been the remaining period of a child's minority. See *Interurban Ry. Co.* v. *Trainer,* 150 Ark. 19, 233 S. W. 816, and see, also, *St. L. S. F. Ry. Co.* v. *McCarn,* 212 Ark. 287, 205 S. W. 2d 704. With this point understood, we examine the testimony in this case.

The evidence shows that Tommy Perryman was 14 years and 8 months of age at the time of his death. The father, James T. Perryman, testified that the family lived on a 10-acre tract, and that Tommy, with the other children—when not in school—helped around the house and in growing and selling watermelons and other produce; that Tommy's earnings were "used to buy clothes and stuff like other boys"; that part of the boy's earnings were retained by the parent; and that the total return from the 1946 watermelon crop of all the children was $162. On this meager evidence of the earnings and services and contributions of the minor, we cannot sustain a judgment in excess of $2,500. Under the facts shown here, any amount greater than $2,500 for the father for loss of services of the minor is grossly excessive. So, if a remittitur is entered within 15 judicial days reducing this judgment of James T. Perryman to $2,500, then the judgment will be affirmed for the remaining $2,500; otherwise, the judgment will be reversed and the cause remanded.

B. There was a verdict for Voile Ray Aldridge for $10,000 for his personal injuries. The collision occurred on June 23rd; the boy was taken immediately to a hospital and kept under an oxygen tent for several days; he did not regain consciousness until July 1st; he remained in the hospital until July 4th, and then remained in bed in his home for three weeks thereafter. He suffered a frac-

tured skull, two broken ribs, a broken left arm, a collapsed lung and a severe wound near the rectum. He has permanent scars on his forehead and nose, and a permanent thickening of the bony growth in the skull. He still suffers pain. Based on the above-mentioned injuries, we are unable to say that the verdict is grossly excessive.

C. There was a verdict for J. J. Aldridge, father of Voile Ray Aldridge, for $1,000 for expenses and for loss of services of the minor. The evidence shows that Mr. Aldridge paid hospital and medical expenses amounting to $299.35; and that the minor is unable to work as before. We cannot say that this verdict is grossly excessive.

D. There are three other verdicts, and we cannot say that any of them is grossly excessive. They were: for Roosevelt Foster, $100; Mrs. Nancy Foster, $400; and Perryman, administrator, $25.

## Conclusion

If a remittitur be entered within 15 judicial days reducing the judgment for James T. Perryman to $2,500, then that judgment will be affirmed for the remaining $2,500. Otherwise, that judgment will be reversed and that cause remanded. All the other judgments are affirmed. The costs of this appeal are to be paid by the appellee, Perryman, since the action was consolidated by consent, and since there is a substantial reduction in the total amount of the judgments involved in this appeal.

The Chief Justice dissents on the ground that appellees' proof does not substantially negative the overwhelming evidence given on behalf of the Railroad that the reckless indifference of youthful motorists was the proximate cause of injury. Mr. Justice McHANEY (now ill and absent) voted to reverse and dismiss when the appeal was considered on April 6th. He asked that his dissent be noted.