**SOUTHERN LUMBER COMPANY,**
Plaintiff,

v.

**Guy A. THOMPSON, Trustee, Missouri
Pacific Railroad Company, Debtor,
Defendant.**

**No. 646.**

United States District Court
W. D. Arkansas, El Dorado Division.

Aug. 3, 1955.

W. H. Howard, McGehee, Ark., Lamar Williamson, Monticello, Ark., for plaintiff.

S. Hubert Mayes, Little Rock, Ark., for defendant.

MILLER, District Judge.

On June 20, 1955, this case was tried to the Court, without a jury, and at the conclusion of the trial the case was submitted, subject to the filing of briefs by the parties in support of their respective contentions. The briefs have been received, and now the Court, having considered the ore tenus testimony of the witnesses, the pleadings, exhibits, stipulations, and briefs of the parties, makes and files herein its findings of fact and conclusions of law, separately stated.

### Findings of Fact

1.

The plaintiff is a citizen of the State of Arkansas. The defendant is a citizen of the State of Missouri. The amount in controversy, exclusive of interest and costs, exceeds the sum of $3,000.

2.

On August 3, 1954, at approximately 3:45 p. m., M. M. James, an employee of the plaintiff, was driving a 1949 Mack

truck, owned by the plaintiff, in a westerly direction upon State Highway 4 in the City of Warren, Arkansas.

At the same time a Diesel engine, owned by the defendant, was being operated in a northerly direction on the Missouri Pacific track, and was approaching the crossing of the track and State Highway No. 4.

**3.**

At the site of the crossing involved herein, the track runs generally north and south, and Highway No. 4 runs generally east and west. The highway is heavily traveled at this point, and defendant's trains cross the intersection rather frequently, although on no particular time schedule. On the south side of the highway and immediately east of the track there are located two or more houses, some shrubbery, weeds and other undergrowth, which obstruct the view of persons in vehicles traveling west upon the highway, and likewise obstruct the view of persons operating trains traveling north on the Missouri Pacific track. A cross-bar railroad crossing sign is located approximately 11 feet east of the track and 5 feet south of the highway pavement. Immediately east of the track the paved highway, from curb to curb, is 24 feet 2 inches. Persons traveling west on the highway do not have a clear view of the track to the south until they are within ten or twelve feet of the crossing.

Approximately one block west of the crossing is a traffic signal light. One block south of the crossing is Wheeler Street, which runs parallel to Highway No. 4. It is 457 feet from the south curb of Highway No. 4 to the north curb of Wheeler Street.

**4.**

Immediately prior to the accident involved herein, the defendant's engine had been engaged in switching operations in the Bradley Lumber Company yards, which were about 750 feet south of the Highway 4 crossing. When going into the yards the engine had been pulling or pushing some box cars and, as required by railroad rules, a member of the train crew flagged the crossings in the City of Warren, including the Highway 4 crossing. After the box cars had been disposed of in the Bradley Lumber Company yards, five members of the train crew were riding in or on the engine. The engine was 55 feet long, 14 feet high, and 10 feet wide, and the cab was located near the front of the engine. The engineer, M. T. Hickingbotham, was operating the engine and was on the west side of the cab. The fireman, M. L. Adams, was on the east side of the cab. The engine was a Diesel engine, and could be operated either forward or backward. As it left the Bradley Lumber Company yards traveling in a northerly direction, the engine was proceeding backward, and a brakeman, R. E. Hagan, was riding on the west side of the rear of the engine, which was the first part of the engine approaching the intersection of the track and highway. Two other brakemen were riding on the front of the engine, which was the last part of the engine approaching the intersection.

As the train started out of the Bradley yards, the engineer started the ringing of the automatic bell and also began his whistle signals for the Wheeler Street crossing, which was the first public crossing. After crossing Wheeler Street, the engineer discontinued the ringing of the bell and the sounding of the whistle until the engine neared the Highway No. 4 crossing, when said signals were again given.

Between Wheeler Street and Highway 4, the track is slightly downgrade, and the train was traveling about 6 or 7 miles per hour between the crossings. However, as the engine neared the Highway 4 crossing, the engineer slowed the engine to approximately 3 miles per hour.

The engineer, being on the west side of the cab, was not in a position to see any traffic approaching from the east. The fireman was on the east side of the cab, and when the engine was approximately 120 feet from the Highway 4 crossing, he glanced through or between some houses on the east side of the track and noticed

the logs on the plaintiff's moving truck. The shrubbery and other obstructions then blocked his view, and he did not see the truck again until the engine was approximately 10 feet from the crossing. At that time he noticed the truck was attempting to stop, but apparently would not be able to do so, and he immediately told the engineer to stop the engine.

Mr. Hagan, the brakeman, had been riding on the steps on the west side of the rear of the engine (which was the part of the engine first approaching the intersection), and first noticed defendant's truck when the engine was about 20 feet from the Highway 4 crossing. As soon as the brakeman saw the truck would not be able to stop, he signaled the engineer to stop the engine and at the same time he jumped off the engine, apparently to avoid any injury to himself. With the engine proceeding at 3 miles per hour, Hagan could easily have flagged the crossing and warned traffic of the approach of the engine, but he did not do so because the railroad rules did not require him to flag such a crossing when the engine was not pulling or pushing any box cars.

The engineer received the signal of the brakeman and the warning of the fireman at approximately the same time, and he immediately applied the emergency brakes of the engine. However, he was unable to stop the engine, and the truck and the engine collided at about the north half of the highway. Adams and Hagan were the only members of the train crew who saw the truck prior to the collision.

### 5.

The defendant's driver, M. M. James, had driven over this crossing many times, and was familiar with the physical facts. On the day of the accident he had been hauling logs, and the truck was loaded with logs at the time of the collision. Before reaching the intersection, James had been driving defendant's truck approximately 20 to 25 miles per hour. As he neared the intersection he slowed the truck to approximately 15 miles per hour, and was attempting to regulate his speed in such a manner that he could reach the traffic signal one block west of the crossing at a time when the signal was green. When he was a short distance from the track he looked to his right and observed nothing. He then looked to his left, and at that time saw and heard the engine. This was the first time he was aware of the approach of the engine, and the truck was only a few feet from the track. James applied his brakes and swerved the truck to the right in an effort to avoid the collision, but he was unable to stop before the truck and the engine collided. The point of impact was the left front of plaintiff's truck and the left rear of the engine. (Since the engine was traveling backward, the point of impact was actually the front left or northeast part of the engine and the left front or southwest part of the truck.)

Immediately prior to the collision, two automobiles had been following plaintiff's truck. The first automobile was approximately 20 to 25 feet behind plaintiff's truck, but none of the occupants of this vehicle were witnesses in the trial of the case. The second car, which was about 20 to 25 feet behind the first car, was being driven by Russell Marshall, who had as a passenger Allen Childs. Childs did not see or hear the defendant's engine until it was right at the edge of the highway, and Marshall did not see or hear the engine until approximately the time it collided with the plaintiff's truck. At the time Marshall and Childs first observed the engine, their automobile was about 100 feet from the crossing. Marshall, Childs, and James each had normal hearing.

After the impact the front of plaintiff's truck was dragged a few feet to the north and the front end of the truck was severely damaged. However, the steps and the brake cylinder on the left rear of the engine were the only parts of the engine that sustained any damage.

### 6.

Subsequent to the accident the plaintiff's truck was taken to its garage, and

was partly disassembled in order that the frame could be straightened. The truck was taken to Little Rock, where the frame was straightened, and it was then returned to Warren, reassembled, and sent to Memphis by trailer for repair. The cost of the repair work done in Memphis was $3,567.35. In addition to that, the plaintiff was required to spend the sum of $1,563.87 in effecting the repair of the truck, making the total repair cost $5,131.22.

The truck had been specially built for the plaintiff at a cost in excess of $16,000, and had been in use for approximately five years. After the repairs were made the truck was in substantially the same condition it was in prior to the accident.

### Discussion

The plaintiff contends that the defendant's employees were guilty of negligence in that they failed to keep a proper lookout; failed to exercise reasonable care after they discovered, or could have discovered, the peril of the plaintiff's truck; failed to have a flagman or warning device at the crossing; and failed to ring the bell or blow the whistle as required by the Arkansas law.

The defendant contends that its employees complied with all the statutory requirements and exercised due care under the circumstances then existing. Defendant also contends that even if its employees were guilty of negligence, the plaintiff was guilty of contributory negligence which was equal to or greater in degree than that of the defendant's employees, thus precluding any recovery by plaintiff under the Arkansas Railroad Comparative Negligence Statute.

### Lookout

Section 73–1002, Ark.Stats.1947 Ann., requires persons operating trains in the State of Arkansas to keep a constant lookout for persons and property upon or approaching the tracks (see, Missouri Pacific Railroad Company v. Eubanks, 200 Ark. 483, 139 S.W.2d 413), and provides that contributory negligence will not bar recovery by an injured person where, if such lookout had been kept, the persons operating the train could have discovered the peril of the injured person in time to have prevented the injury by the exercise of reasonable care after the discovery of such peril.

Ordinarily, the duty devolves particularly upon the engineer to keep the lookout, but where he is not in a position to keep an effective lookout it is the duty of the fireman or other members of the train crew to keep said lookout. Missouri Pacific Railroad Company v. Edwards, 178 Ark. 732, 14 S.W.2d 230.

In the instant case the engineer, being on the west side of the cab, was not in a position to observe traffic approaching from the east. However, the evidence discloses that both the fireman, Mr. Adams, and the brakeman, Mr. Hagan, were keeping a lookout prior to and at the time of the accident. There was no testimony to the contrary, nor were there any facts or circumstances indicating the failure to keep such lookout, and therefore the Court is convinced that a proper lookout was kept and that Section 73–1002 was not violated. St. Louis-San Francisco Railway Co. v. Willingham, 8 Cir., 177 F.2d 167; St. Louis-San Francisco Railway Company v. Thurman, 213 Ark. 840, 213 S.W.2d 362; Kansas City Southern Railway Co. v. Mickel, 207 Ark. 872, 183 S.W.2d 45.

### Discovered Peril

The evidence likewise conclusively establishes that the doctrine of discovered peril is inapplicable. Defendant's employees were keeping a lookout and, as soon as they discovered that plaintiff's truck might not be able to stop, they immediately did everything they could to stop the engine and avoid a collision. In other words, there was nothing to indicate that defendant's employees failed to keep a proper lookout or to act diligently to prevent striking the truck after its dangerous situation was discovered. Under these circumstances the

doctrine of discovered peril does not apply. Haney v. Missouri Pacific Railroad Co., 214 Ark. 673, 217 S.W.2d 610.

### Statutory Signals

Section 73–716, Ark.Stats.1947 Ann., provides, inter alia:

"A bell of at least thirty [30] pounds weight, or a steam whistle, shall be placed on each locomotive or engine, and shall be rung or whistled at the distance of at least eighty [80] rods from the place where the said road shall cross any other road or street, and be kept ringing or whistling until it shall have crossed said road or street, * * *."

The duty to ring the bell or blow the whistle applies to switching operations. Missouri Pacific Railroad Co. v. Powell, 196 Ark. 834, 120 S.W.2d 349. And the duty exists even though the train is put in motion at a point less than 80 rods from the crossing, although in such a case the signals need only be given from the time the said train is set in motion. Missouri Pacific Railroad Co. v. Riley, 198 Ark. 372, 128 S.W.2d 1005.

In the instant case, as is usual in crossing accident cases, there was a conflict in the evidence as to whether or not the bell was rung or the whistle was blown for the Highway 4 crossing. The defendant's employees testified that the bell was ringing and the whistle was blowing, although their testimony was slightly conflicting as to the manner in which the signals were given. As opposed to this, plaintiff's driver and two other eyewitnesses testified that, although their hearing was good, they did not hear a whistle blown or a bell ringing until the engine was at or very near the crossing. Their testimony was also slightly conflicting as to the time the bell or whistle was first sounded. It is a settled rule in Arkansas that testimony of persons with good hearing who are in a position to hear a bell ringing or a whistle blowing, that no such signal was heard, is positive rather than negative evidence. Phillips v. Kurn, 8 Cir., 145

F.2d 908; Missouri Pacific Railroad Co. v. Peters, 220 Ark. 657, 249 S.W.2d 304; St. Louis-San Francisco Railway Co. v. Perryman, 213 Ark. 550, 211 S.W.2d 647.

A consideration of the testimony of the witnesses in the light of the facts and circumstances surrounding the accident convinces the Court that defendant's employees did not blow the whistle or ring the bell of defendant's engine after crossing the Wheeler Street intersection until the engine had almost reached the Highway 4 crossing. Inasmuch as the Highway 4 crossing was partly a blind crossing, the failure of defendant's employees to give the proper signals clearly amounted to negligence. As to the importance of giving statutory signals at blind crossings, see, Missouri Pacific Railroad Co. v. Heitman, Ark., 279 S.W.2d 280, decided May 23, 1955.

### Flagman or Warning Device

The general rule governing the necessity of a flagman or warning device at railroad crossings is stated in Fleming v. Missouri and Arkansas Railway Company, 198 Ark. 290, 294, 128 S.W.2d 986, 988, as follows:

"It is the settled rule that whether failure of a railroad company to station a flagman at a crossing constitutes an omission of such care as an ordinarily prudent person would use under the same or similar circumstances, is a question of fact where there are obstructions which materially hinder the view of approaching trains, provided the crossing is used frequently by the public, and numerous trains are run. Inasmuch as permanent surroundings may create a hazardous condition, the rule of care goes further and requires precautions where special dangers arise at a particular time. It is said that the obligation exists, at an abnormally dangerous crossing, to provide watchmen, gongs, lights, or similar warning devices not only for the purpose of giving notice of approaching trains, but such care is to be equally observed where the

circumstances make their use by the railroad reasonably necessary to give warning of cars already on a crossing, whether standing or passing, as where a crossing is more than ordinarily dangerous because of obstructions to the view interfering with the visibility of the responsible train operatives, or those approaching the track."

To the same effect, see Hawkins v. Missouri Pacific Railroad Company, 217 Ark. 42, 228 S.W.2d 642.

■ The Court is convinced that under the facts existing in the case at bar, even if the statutory signals had been given, the defendant's employees nevertheless were negligent in failing to have a flagman at the Highway 4 crossing. To begin with, the crossing was a blind crossing insofar as traffic approaching from the east was concerned. The engine was backing rather than going forward, and thus the engineer, riding in the cab on the west side, could not see traffic approaching from the east. Likewise, even though the fireman was riding on the east side of the cab, since the cab was toward the south end of the engine, he could not observe traffic approaching from the east on the highway until the north end of the engine had almost reached the intersection. Thus, the only person who could keep a fairly effective lookout was the brakeman Hagan, and the effectiveness of his lookout was greatly diminished by the necessity of his signaling the engineer if and when any danger appeared, and the engineer in turn stopping the engine.

The crossing is located in the City of Warren, and Highway 4 at that point was and is heavily traveled. Evidently the traffic on this highway, together with the obstructions south of the highway and east of the track, made it very difficult for persons traveling west to hear trains approaching from the south. There was no warning device or automatic signal at the crossing, other than the usual cross-bar warning sign, and the trains crossing the intersection were on no particular time schedule and therefore traversed the crossing at different times during the day.

Immediately prior to the accident the engine was traveling at a very slow speed. There were five crewmen aboard, including three brakemen, any one of whom could have flagged the crossing. In fact, Mr. Hagan testified that he could have flagged the crossing, but did not do so because the railroad rules did not require such flagging when the engine was traveling alone.

A consideration of all of these circumstances convinces the Court that defendant's employees, in the exercise of ordinary care, should have placed a flagman at this crossing, and that their failure to do so amounted to negligence. Stated differently, the Court feels that an ordinarily prudent person—under the same circumstances—would have used a flagman at this crossing, and in failing to exercise the care of an ordinarily prudent person defendant's employees were guilty of negligence. Compare, Hawkins v. Missouri Pacific Railroad Company, supra.

Although the question is not presented in this case, it may be noted in passing that the practice, if it is a practice, of flagging certain crossings when the engine is pulling or pushing cars and not flagging said crossings when the engine is traveling alone, might well tend to confuse and trap persons who frequently traverse such crossings. Persons customarily traversing a particular crossing, and observing flagmen at the crossing when trains are approaching or passing, might properly believe that the train crew always places a flagman at the crossing when a train is approaching, and of course said persons would not be advised of the fact that no flagman is used when an engine is traveling alone.

In other words, just as a failure of an automatic warning device to work, or the failure to close a gate intended to keep travelers from crossing a track when trains are approaching, offer an invitation to a traveler, or an assurance

to him that the way is clear, and he might proceed safely, similarly the failure of a railroad company to station a flagman at a crossing where a flagman is customarily used might be an invitation and an assurance to travelers that no train is approaching and that they can cross safely. See, Missouri Pacific Railroad Co. v. Heitman, Ark., 279 S.W.2d 280, decided May 23, 1955.

### Contributory Negligence

The duty resting upon plaintiff's driver in approaching the crossing is clearly stated in Missouri Pacific Railroad Company v. Howard, 204 Ark. 253, at page 257, 161 S.W.2d 759, at page 761, wherein the Court said:

"The very fact that box cars were spotted so near the crossing, as to cut off the view to the south, made it her duty, in the exercise of due care, to approach the main line track in such a way as to permit her to get a clear view to the south after the box cars ceased to obstruct her view, and to stop, if necessary, to avoid the danger. In other words, as the danger increases, the degree of care required to free one of contributory negligence in a crossing accident increases. As said in Louisiana & A. Ry. Co. v. Ratcliffe, 88 Ark. 524, 115 S.W. 396, 400: 'There is no imperative duty resting upon him to stop and look and listen. The duty is to look and listen. If this cannot be properly discharged without stopping, then he must stop. If it can be, then there is no necessity of stopping.'"

See also Missouri Pacific Railroad Company v. Binkley, 208 Ark. 933, 188 S.W.2d 291.

It is evident that plaintiff's driver failed to exercise the care required of him under the Arkansas law. The fact that his view to the south was obstructed required him, in the exercise of ordinary care, to approach the crossing with more caution than would have been necessary at a clear intersection. But, instead of exercising the necessary due care, plaintiff's driver was paying particular attention to the stop light one block west of the crossing, and failed to have his truck under reasonable control and to keep an effective lookout as he approached said crossing. It is clear, then, that the plaintiff's driver was guilty of contributory negligence in the operation of plaintiff's truck.

### Comparative Negligence

The Court having found that both the plaintiff's employee and the defendant's employees were guilty of negligence, under the provisions of the Arkansas Railroad Comparative Negligence Statute, § 73–1004, Ark.Stats.1947, Ann., it becomes necessary for the Court to determine the degree of negligence attributable to each party.

In approaching the crossing involved herein, both the plaintiff's employee and the defendant's employees were equally charged with the duty to exercise ordinary care to avoid an accident. Missouri Pacific Railroad Co. v. Frye, 214 Ark. 92, 98, 214 S.W.2d 495; Missouri Pacific Railroad Company v. Yelldell, 199 Ark. 343, 344, 133 S.W.2d 642. Similarly, the plaintiff's employee had the right to assume that the defendant's employees would exercise proper care in the operation of its trains, Missouri Pacific Railroad Co. v. Lemons, 198 Ark. 1, 127 S.W.2d 120, and the defendant's employees had the right to assume that plaintiff's employee would exercise ordinary care in the operation of plaintiff's truck, Missouri Pacific Railroad Co. v. Doyle, 203 Ark. 1111, 1117, 160 S.W.2d 856.

When the conduct of the parties in the instant case is viewed in the light of the above stated rule, the Court is of the opinion that the negligence of defendant's employees was greater than the negligence of plaintiff's employee. While it naturally is difficult to ascertain the degree of negligence with any mathematical certainty, the Court feels that in this case the negligence proximately causing the accident was attributable to the parties in the following ratio: de-

**100**

fendant's employees 60 percent; plaintiff's employee 40 percent. On the question of comparative negligence, compare, Phillips v. Kurn, supra; Chicago, Rock Island & Pacific Railroad Co. v. Sparks, 220 Ark. 412, 248 S.W.2d 371; Kansas City Southern Railway Co. v. Winter, 217 Ark. 148, 228 S.W.2d 1001; St. Louis-San Francisco Railway Co. v. Perryman, supra; St. Louis-San Francisco Railway Co. v. McCarn, 212 Ark. 287, 205 S.W.2d 704; Smith v. Missouri Pacific Railroad Co., 208 Ark. 40, 184 S.W.2d 951; Missouri Pacific Railroad Co. v. Walden, 207 Ark. 437, 181 S.W.2d 24.

### Damages

 Under Arkansas law the measure of damages to a motor vehicle is the difference in the fair market value thereof at the time and place of the collision, immediately before and immediately after said collision. In the absence of proof as to said difference in market value, however, the Court or jury may consider evidence of the cost of repairing the vehicle in determining the extent of its damages. Nicholas v. Bingamon, 219 Ark. 748, 244 S.W.2d 782; Golenternek v. Kurth, 213 Ark. 643, 212 S.W.2d 14, 3 A.L.R.2d 593; Payne v. Mosley, 204 Ark. 510, 162 S.W.2d 889.

In the instant case, the total cost of repairing plaintiff's truck was $5,131.22, and the evidence disclosed that the truck was in substantially the same condition after being repaired as it was immediately prior to the accident. Therefore, said sum of $5,131.22 fairly represents the damage to plaintiff's truck.

Since the Court has found that the contributory negligence of plaintiff's employee was 40 percent, plaintiff's total damages must be reduced by said amount. Thus, the amount of damages plaintiff is entitled to recover is $3,078.-73.

### Conclusions of Law

1.

The Court has jurisdiction of the parties to and the subject matter of this action.

2.

The defendant's employees were guilty of negligence in the operation of defendant's engine.

3.

Plaintiff's employee, M. M. James, was guilty of contributory negligence in the operation of plaintiff's truck.

4.

The degree of contributory negligence chargeable to plaintiff was 40 percent, and the plaintiff's total damages should be reduced in that amount.

5.

Plaintiff is entitled to recover of and from the defendant the sum of $3,078.73.

A judgment in accordance with the above should be entered.